# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | |
|---|---|
| **RICHARD KOUGH, BRIAN LITTLEJOHN, CRAIG PRIESTER, STERLING HARLEY, THERL TAYLOR, ROY SUTHERLAND and JOSEPH WILSON,**<br><br>        **Plaintiffs,**<br><br>**vs.**<br><br>**SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, WARDEN LEVERN COHEN, individually and/or in his official capacity as warden of Ridgeland Correctional Institution,**<br><br>        **Defendants.** | **C/A No.: 0:17-2938-JFA-PJG** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT (RESPONSE TO ECF# 82-88)

The Defendants, the South Carolina Department of Corrections and Warden Levern

Cohen, individually and/or in his official capacity as Warden at Ridgeland Correctional

Institution have moved the Court to grant them summary judgment pursuant to Fed. R. Civ. Pro.

56. The Defendants motion is based on following:

(1) The South Carolina Tort Claims Act Bars Plaintiff's Claims;
(2) Failure to offer proof of the elements required to state a prima facie case under 42 U.S.C. § 1983;
(3) Post Hoc, Ergo Propter Hoc and Res Ipsa Loquitor;
(4) Failure to establish any of the elements necessary for injunctive relief; and
(5) Failure to Exhaust Administrative Remedies.

The Defendants have filed seven individual motions, one for each Plaintiff.[1] The Plaintiffs, Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Theryl Taylor, Roy Sutherland, and Joseph Wilson, oppose this motion for the reasons hereinafter stated.

## STATEMENT OF FACTS

The South Carolina Department of Corrections (hereinafter "SCDC") operates Ridgeland Correctional Institution in Jasper County, South Carolina. Warden Levern Cohen at all times pertinent to the Amended Complaint, was "charged with the management of all staff regarding hiring, training, promotion, discipline, evaluation and firing; maintaining a safe working environment; monitoring compliance with all state policies and procedures; overseeing prison programs in education, mental health and infirmary; enforcing rules, regulations, policies, and laws regarding incarceration and employee conduct; enforcing policies regarding intake, classification, treatment programs and discipline; [and] maintaining a proper system for the proper care, humane treatment, feeding, clothing, and safety of inmates." (Amended Complaint, para. 11-21).

Plaintiffs, Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Theryl Taylor, Roy Sutherland, and Joseph Wilson are inmates in the SCDC system who were incarcerated in Ridgeland Correctional Institution during the years of 2016 and 2017. (See generally Pltf.'s Amended Complaint). During this period and continuing to the present, Defendants South Carolina Department of Corrections, Warden Levern Cohen, and the

---

[1] Plaintiff Kough- ECF 88; Plaintiff Priester ECF 87; Plaintiff Wilson ECF 86; Plaintiff Sutherland ECF 85; Plaintiff Littlejohn ECF 84; Plaintiff Taylor ECF 83; and Plaintiff Harley ECF 82. The Plaintiffs have answered each of these motions in this Response in Opposition. Where necessary the Plaintiffs have broken down their Responses by individual Plaintiff (only if the Defendants raised individualized arguments) within this Memorandum. However every argument is identical for each Plaintiff and as such is reflected in this one Response in Opposition instead of seven responses.

correctional staff at Ridgeland Correctional Institution, have failed to take even the most basic steps to protect inmates from physical assault by other inmates, including members of prison gangs. These Defendants have specifically failed to take any meaningful steps to keep inmates from possessing "illegal contraband weapons" which are often brought into the prison by guards. Even worse, guards routinely leave cell or wing doors unlocked, abandon their posts, and fail to intervene when inmate fights occur. (See Plf. Amended Compl. para. 12-21). All in violation of SCDC's policies and procedures.  The guards regularly allow inmates from one wing of the prison into other wings and have essentially become complicit with this type of behavior. This conduct makes it virtually impossible to protect innocent inmates from gang members harming them. Moreover, guards are often not disciplined for their violations of SCDC procedures and inmates are rarely charged, or punished, for their violent assaults. (See *Id.*).

As a result of the above failures, and specifically the failure to provide even a minimum level of security for inmates, inmates are constantly at risk of violent stabbings and beatings from other inmates, including gang members. During 2016 and 2017, many inmate stabbings and attacks occurred at Ridgeland Correctional. As such the Plaintiffs incidents are not isolated occurrences but represent an unfortunate pattern, practice, and custom that has been established within the South Carolina Department of Corrections. The Defendants, had, and still have, knowledge of these failures but are consciously indifferent to the risk posed by their conduct and the injuries that have already been suffered by many inmates.

Plaintiffs, Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Theryl Taylor, Roy Sutherland, and Joseph Wilson, are all victims of inmate stabbings or attacks at Ridgeland Correctional Institution. (See generally Plf.'s Amended Compl.).  In their Affidavits,

the Plaintiffs have summarized the circumstances in which they were attacked, the injuries they

suffered, and the difficulties imposed by the Defendants to prevent them from seeking remedies.

## SCDC INMATE GRIEVANCE SYSTEM

SCDC has established an Inmate Grievance System that contains procedures with which

inmates are required to comply if they wish to complain about any aspect of prison life. (Pls. Ex.

1). Subject to several exceptions, the Inmate Grievance System requires inmates initially to

attempt to resolve grievances informally by filing a Request to Staff Member form. Informal

resolution is not required, however, when the matter involves allegations of criminal activity.

With respect to criminal activity complaints, the inmate must file Form 10-5 Step 1 within five

working days of the incident:

> Inmates must make an effort to informally resolve a grievance by submitting a
> Request to Staff Member Form to the appropriate supervisor/staff within eight (8)
> working days. However, in certain cases, informal resolution may not be
> appropriate or possible (e.g. when the matter involves allegations of criminal
> activity)….If informal resolution is not possible, the grievant will complete Form
> 10-5, Step 1 which is located in common areas, i.e., living areas, libraries etc., and
> will place the form in a designated grievance drop box within five working days
> of the alleged incident.

(Pls. Ex. 1)(Inmate Grievance System, para. 13.2). Upon receipt of a criminal activity grievance,

the Inmate Grievance Coordinator must refer the criminal activity grievance "immediately" to

the Chief of the Inmate Grievance Branch for investigation by the Division of Investigations. If it

is determined that a criminal investigation is appropriate, the grievance is held in abeyance until

the criminal investigation is completed. If a determination is made that criminal investigation is

not required, the grievance is processed in accordance with the procedures applicable to non-

criminal activity grievances:

> **15. GRIEVANCES ALLEGING CRIMINAL ACTIVITY**:
> Any grievance which alleges criminal activity will be referred immediately
> to the Chief/designee, Inmate Grievance Branch. The IGC will note on the

4

> grievance tracking CRT screen that the grievance has been forwarded to
> the Inmate Grievance Branch for possible investigation by the Division of
> Investigations and the date on which the grievance was forwarded. The
> Chief/designee, Inmate Grievance Branch, will consult with the Division of
> Investigations to determine if a criminal investigation would be appropriate.
> If deemed appropriate, the grievance will be forwarded to the Division of
> Investigations, to be handled in accordance with applicable SCDC
> policies/procedures. The grievance will be held in abeyance until the
> Division of Investigations completes their review/investigation. If it is
> determined that a criminal investigation is not required, the grievance will
> be processed in accordance with the procedures contained herein.

(Pls. Ex. 1)(Inmate Grievance System, para. 15).

 If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is

required to respond in writing within 45 days and advise the inmate of his right to appeal to the

next level:

> 13.5 The Warden will respond to the grievant in writing (in the space
> provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for
> the decision rendered and any recommended remedies. The grievant will
> also be informed of his/her rights to appeal to the next level. The Warden
> will respond to the grievant no later than 45 days from the date the
> grievance was formally entered into the OMS system by the IGC
> .
> The response will be served by the IGC to the grievant, within ten (10)
> calendar days, and the grievant will sign and date the response
> acknowledging receipt. The IGC will maintain the original grievance for
> the inmate's grievance file and a copy will be given to the inmate.

(Pls. Ex. 1)(Inmate Grievance System, para. 13.5). The inmate may then appeal by filing a Form

10.5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of receipt of the

response. The appeal is referred to the "responsible official" who is required to make a final

decision within 90 days.  (Pls. Ex. 1)(Inmate Grievance System, para. 13.5).

The Plaintiffs contend that the Defendants' acted intentionally in permitting inmate gang

members to have access to weapons, in failing to appropriately ensure the safety and security of

inmates, and subjecting them to violence. The assaults that occurred to each Plaintiff are criminal

actions involving gang members and should be treated as such. The Plaintiffs contend that the Defendants were consciously indifferent to the likelihood that these attacks would occur and thus violated their rights under the Constitution. The Plaintiffs seek damages and injunctive relief for these violations pursuant to 42 U.S.C. § 1983. (See Pltf.'s Amended Complaint).  The Plaintiffs have also asserted state law claims for negligence. (See Pltf.'s Amended Complaint).

## LEGAL STANDARD

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. Brockbank v. Best Capital Corp., 341 S.C. 372, 534 S.E.2d 688 (2000); Moriarty v. Garden Sanctuary Church of God, 334 S.C. 150, 511 S.E.2d 699 (Ct. App. 1999), aff'd, 341 S.C. 320, 534 S.E.2d 672 (2000). "Because it is a drastic remedy, summary judgment should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues." Carolina Alliance for Fair Employment, 337 S.C. at 485, 523 S.E.2d at 799. Under Rule 56(c), SCRCP, the party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact. Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing, and Regulation, 337 S.C. 476, 523 S.E.2d 795 (Ct. App. 1999). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment. Summer v. Carpenter, 328 S.C. 36, 492 S.E.2d 55 (1997); Pye v. Aycock, 325 S.C. 426, 480 S.E.2d 455 (Ct. App. 1997). Because summary judgment is a drastic remedy, it must not be granted until the opposing party has had a "full and fair opportunity to complete discovery."  Dawkins v. Fields, 354 S.C. 58, 69, 580 S.E.2d 433, 439 (2003); Lanham, 349 S.C. at 363, 563 S.E.2d at 334; Doe v. Batson, 345 S.C. 316, 322, 548

S.E.2d 854, 857 (2001); Baird v. Charleston County, 333 S.C. 519, 529, 511 S.E.2d 69, 74

(1999); Baughman v. American Tel. & Tel. Co., 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991)

## ARGUMENT

I. **THE SOUTH CAROLINA TORT CLAIMS ACT DOES NOT BAR PLAINTIFFS STATE LAW CLAIMS BECAUSE THERE IS EVEIDENCE SCDC and/or ITS EMPLOYEES WERE GROSSLY NEGLIGENT.**

Gross negligence means the absence of care that is necessary under the circumstances. The

Defendants argue that the Plaintiff have not presented evidence of gross negligence on behalf of

SCDC and/or its employees. Contrary to this illogical argument there is ample evidence that

SCDC and/or its employees acted grossly negligent under the circumstances in each of the

Plaintiff's claims. Specifically there is evidence by Plaintiff's expert which states:

> "In a confinement operational context, the Defendants, South Carolina
> Department of Corrections and Defendant Warden Levern Cohen were
> deliberately indifferent, callous, wanton, and grossly negligent in not adhering to
> basic confinement responsibilities and utilizing their authority to protect Messrs.
> Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor,
> Roy Sutherland and Joseph Wilson. Defendants were grossly negligent,
> deliberately indifferent and clearly failed to provide Messrs. Richard Kough,
> Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland
> and Joseph Wilson with basic sight and sound supervision, gang management and
> contraband control provisions that would, to a reasonable degree of certainty,
> avoided these life endangerment critical events. These life endangerment critical
> events, involving Messrs. Richard Kough, Brian Littlejohn, Craig Priester,
> Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson were
> operationally foreseeable, anticipated and avoidable only if the Defendants
> operationalized basic sight and sound supervision, gang management and
> contraband control provisions. If these prison security supervision systems were
> operating at a basic and elementary level, the likelihood of critical events of the
> degree and magnitude occurring would be remote. Defendants did not take
> fundamental measures to prevent, detect, respond or contain the obvious
> foreseeable blatant failures prior and during the life endangerment critical events
> which resulted in Messrs. Richard Kough, Brian Littlejohn, Craig Priester,
> Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson being violently
> attacked with weapon(s). These operationally gross negligent and deliberate
> failures resulted in a needless and excessive degree of life endangerment to
> Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl

7

Taylor, Roy Sutherland and Joseph Wilson."

(Pls. Ex. 2)( Plf. Expert Report).

The Defendants specifically argue there is no evidence on the record to support that the Defendants had notice of the Plaintiffs incidents. However, the record is full of evidence supporting the fact that the Defendants had prior notice these incidents would occur. Plaintiff's expert report further explains why each of the Plaintiffs incidents occurred, why SCDC and its employees were grossly negligent, and why the Defendants did in fact have prior notice of these incidents. A few examples of evidence that SCDC did have prior notice and were grossly negligent as noted by Plaintiff's expert are:

> "Further, Defendants were placed on specific notice that the institution was in a critical default mode which promoted, facilitated and caused the critical events of life endangerment against Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson. Specific examples based on the limited documents afforded at this juncture, that placed Defendants on specific notice includes information contained in the South Carolina Department of Corrections Quarterly Report of Confiscated Property, Dated: January 2, 2015. The report reflects, for example, the April 1, 2015 report reflects that 106 homemade knives were confiscated, the July 2, 2015 report reflects that 55 homemade knives were discovered and confiscated, and on the October 9, 2015 report 64 knives were confiscated and discovered. The yield of confiscated weapons operationally validates that the institution was unsecured and operationally advancing further into critical life endangerment status.
>
> The documents[2] reviewed at this juncture gives a clear and concise justification, mandate and notice that Defendants were required to employ preventive measures to protect Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson from present, known and intense endangerment perils. More specifically, in order for the various systems (i.e. basic sight and sound supervision, gang management and contraband control) to properly function, there must be a transition from written policy directives and basic sound correctional practice mandates into actual productivity outcomes.

---

[2] See Pg 22-23 for Mr. Aiken's document list which includes thousands of documents he reviewed and used as evidence in making his opinion that the Defendants did have prior notice of these events.

Ensuring the minimal productivity of the elementary prison safety and security systems (i.e. inmate supervision, contraband control and gang management) were employed, the occurrence of the critical events against Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson would reasonably not have taken place. Defendants did not take required elementary action.

Often as a result of these systems being in failure mode, the ability to effectively ensure the safety and care of Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson were rendered into an operational noncompliance situation without regard to constitutional mandates and sound correctional practice which resulted in jeopardy of their life and safety.

It was absolutely essential for the Defendants to ensure the safety and well-being of staff and inmates, to include Plaintiffs, by addressing the following:
> • identification of the specific security problems in definitive, objective and measurable terms,
> • identify the specific solutions to the security issues that will have a causal and positive direct measurable impact upon the problem,
> • identify the person with the authorization to ensure that the specific solutions are appropriately established, implemented and monitored,
> • identify and allocate the specific resources required to ensure the appropriate solutions are achieved, and
> • establish specific deadlines and measures of productivity during the course of developing and implementing the solutions.

Failure to address these failure in an accountable fashion constitutes operationally, deliberate indifference and gross negligence.

Upon submittal of this Report, I have not been provided validated or objective documentation that Defendants properly investigated, operationally reviewed these critical events, identified and/or adjudicated the perpetrators, conducted an operational assessment of the various systems that should have been operationalized to prevent, detect, respond and contain these life endangerment security situations prior to the violent assaults. It is operationally substantiated that Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson received life endangerment injuries.

It is my opinion, to a reasonable degree of certainly, based upon information received at this juncture, that Defendants acted with deliberate indifference and were grossly negligent to Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson's life endangerment perils. Defendants knew or should have known that the security

and safety of the facility was unstable to the degree that allowed these critical failures as described above, to occur.

Also, it is my opinion, in a prison operational context that these critical events are redundant and consistent regarding the use of weapons to perpetrate extreme violence against Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson. Additionally, it is also redundant and consistent that staff were mostly not present, available, in order to prevent, detect, respond, and contain the life endangerment perils endured by Messrs. Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland and Joseph Wilson before they occurred. These attacks occurred at a chronic level for a high security prison without basic sight and sound security supervision of staff as well as the redundant inability and disregard for the identification and adjudication of the predator inmate population. This renders this facility as being in critical and unstable status which enormously endangers the well-being of inmates, staff and the general community. If decisive, objective, cause and effect measures are not taken, the advent of additional life endangerment critical events will continue."

(Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report).

Notwithstanding the strong expert evidence in this case, that the Defendants did in fact have prior notice of illegal contraband in their facility of ongoing violence and systemic failures, there are also several reports which indicate SCDC had prior notice (for years prior to these incidents) of ongoing violence, contraband and systematic failures. For example, there is one repot that was created by Mr. Tom Roth, which was publically picked up in the news and obtained by a FIOA request, which specifically addresses the reoccurring significant understaffing levels, high contraband levels, and high violence at Ridgeland for years preceding the incidents in the Complaint. This report would also specifically provide evidence of all allegations addressed in the general facts section of Plaintiffs Amended Complaint.[3] Thus there is evidence that the Warden and the employees at SCDC knew their staffing levels had been low

---

[3] The Plaintiff has recently learned about this Report and timely requested it in discovery. It should have been turned over as it is relevant to the allegations in the Amended Complaint and would establish notice and deliberate indifference on behalf of the Defendants. This report is confidential and as such the Plaintiffs cannot file this Report. The Plaintiffs would respectfully request a status conference with the Court shall it be needed to further discuss this Report.

for years yet continued to operate their facility, without placing the additional basic security factors, as Plaintiffs experts opined, to ensure assaults (such as the Plaintiffs) would not occur. Plaintiffs have been provided Security Compliance Reports, Contraband Reports, an approximately 130 pages of MINS that indicate reoccurring contraband issues that precede the incidents in the Complaint and establishes notice to the Defendants that their facility was in failure mode and assaults were continuing to occur. Additionally, it is certainty well know in the prison industry that a primary concern is possession of contraband which almost always leads to further criminal activity, including violence/assaults.

Second, there is also evidence that in each of the Plaintiffs incidents the correctional officers left and/or abandoned the wing just prior to the assaults occurring constituting gross negligence. (Pls. Ex. 4- Affidavit of Richard Kough) (Pls. Ex. 5- Affidavit of Brian Littlejohn) (Pls. Ex. 6- Affidavit of Craig Priester) (Pls. Ex. 7- Affidavit of Joseph Wilson) (Pls. Ex. 8- Affidavit of Therl Taylor). There is also deposition testimony by Defendant Warden Cohen which indicates the proper process when a correctional officer leaves the wing. He states:

```
12 Q Le--- so let's just say there's one for
13 the unit. Is that -- is that common, it so
14 happens there's only one in the unit?
15 A Yeah, that's common. Uh-huh.
16 Q Okay. So then that -- we'll use that
17 example. There's one C.O. on the -- on the unit
18 and for some reason that C.O. needs to leave.
19 What is the proper process for him to be able to
20 leave?
21 A The supervisor would have to be
22 notified for replacement.
23 Q So he needs to be -- notify his
24 supervisor that he needs to leave for whatever
25 reason?
1 A That's correct.
2 Q And then does he need to make sure that
3 there's someone there to cover for him and be
```

11

4 relieved?
5 MR. BUTLER: Same objection.
6 THE DEPONENT: Yes, ma'am.

(See Plf. Ex. 9A) (Depo of Warden Cohen:100-101:12-25,1-6).

12 A Would find someone to go down there to
13 relieve them. And if not, then that wing would be
14 secured.
15 Q And how would it be secured?
16 A Cell by cell.
17 Q What would they -- they would go in and
18 lock all the cell doors?
19 A Yes.
20 Q If any of those actions such as not
21 having proper relief or not locking the cell
22 doors, did -- if those actions didn't occur, that
23 would be a violation of policy, right?
24 MR. BUTLER: Objection.
25 THE DEPONENT: Say if they walked off
1 post and left out the unit, yes..

(See Plf. Ex. 9B) (Depo of Warden Cohen:103-104:12-15,1).

The above testimony by Defendant Warden Cohen also validates the Plaintiffs allegations

that if a correctional officer leaves the wing for any reason then he must make sure he is

properly relieved and if he is not properly relieved he must secure all cell doors. Failure

to do so is a violation of policy. In this case the Plaintiffs have all stated that the

correctional officers left their posts/wings when their incident occurred and  no other

correctional officer was assigned, in violation of the known post order, creating a huge

safety and security concern, placing the lives of the Plaintiffs in risk, and constituting

gross negligence. (See Plf. Amended Compl. ¶¶ 24, 40, 51, 63, 89,102,103, 112(f)) (See

also (Pls. Ex. 4- Affidavit of Richard Kough) (Pls. Ex. 5- Affidavit of Brian Littlejohn)

(Pls. Ex. 6- Affidavit of Craig Priester) (Pls. Ex. 7- Affidavit of Joseph Wilson) (Pls. Ex.

8- Affidavit of Therl Taylor).

The Defendants are mistaken when they tell the Court there is no policy or procedure requiring that a correctional officer be present on the housing wing at all time. In fact SCDC's Post Order policy, #17, specifically states: "Officer shall remain on the assigned wing at all times to maintain sight and sound of inmates. (Pls. Ex. 20- Post Order).

There is also deposition testimony by the Major of Security, Ms. Washington, in which she provides additional evidence of gross negligence on behalf of SCDC. She testified to known ongoing violations of correctional officers. For example in not following policy in regards to count which she believes is a serious security concern. She also admits she does not keep up with the assaults that occur at the facility, but is the only Major of Security of Ridgeland. She also admits that it is has been known that the past few years there have been issues with employees not following policy or post orders and bringing in contraband.

```
1 A Yeah. Sometimes we can't get it clear.
2 Q Do you know why?
3 A People see one and write two or they see two
4 and write one or something. I don't know what
5 they be doing.
6 Sometime an area counting them twice
7 because the inmate's supposed to be over here,
8 and that person is counting them because
9 they're supposed to be there, but they're not
10 there, they done left and went back to the
11 dorm, and then the dorm officer counting them.
12 So it's different reasons why count does
13 not clear, but no matter the reason, it's
14 serious.
15 Q That's a safety concern, right?
16 MR. RISER: Object to the form.
17 THE WITNESS: That's a security concern
18 for the staff, the inmates, and the
19 public.
```

(See Plf. Ex. 10A) (Depo of Washington 122:1-19).

    3 Q But from a security standpoint, you don't keep
    4 up with the assaults?
    5 A No, ma'am, not personally.

(See Plf. Ex. 10B) (Depo Washington 97: 1-25).

    18 Q Do you know if in the last few years there
    19 have been any issues with employees not
    20 following policy or post orders?
    21 MR. RISER: Object to the form.
    22 THE WITNESS: Yes.

(See Plf. Ex. 10C) (Depo Washington 84: 1-25).

    16 Q Has the bringing in of contraband been a big
    17 security concern recently?
    18 MR. RISER: Object to the form.
    19 THE WITNESS: It's a concern. It's
    20 always a concern.
    21 BY MS. SULPIZIO:
    22 Q What sorts of efforts have you or the warden
    23 or anyone on security implemented or done to
    24 address those concerns?
    25 A Just follow procedures that the agency have in
    1 place. Everybody that comes in got to be
    2 frisk-searched, turn your pockets inside out,
    3 take your shoes off, take your belt off, take
    4 your vest off, get your bag searched. We go
    5 through the procedures that the agency have in
    6 place to combat contraband being brought in.
    7 Q Then how is that contraband still being
    8 brought in? Are the procedures maybe not
    9 being followed?
    10 MR. RISER: Object to the form.
    11 THE WITNESS: I can't say that it's not
    12 being followed because they pat me down
    13 every day I come to work.
    14 BY MS. SULPIZIO:
    15 Q So then how would the employees be getting it
    16 in if procedures are being followed?
    17 MR. RISER: Object to the form.
    18 THE WITNESS: I can't answer that.
    19 BY MS. SULPIZIO:
    20 Q Well, if they're getting it in, then would you
    21 agree that some sort of failure was in the
    22 procedure?

23 MR. RISER: Object to the form.
24 THE WITNESS: Something going on. I
25 don't know what it is. I don't know.

(See Plf. Ex. 10D) (Depo Washington 64: 1-25).

As shown above there is deposition testimony, expert testimony, and written

documentation that provide evidence to establish gross negligence on behalf of SCDC

and its employees.

If any individual arguments, related to the S.C. Tort claims causes of actions, are

separately noted for an individual Plaintiff in the Defendants Motions (ECF 82-88) they are

addressed below:

**As to Plaintiff Kough**

The Defendants specifically argue that Sgt. Torres was not grossly negligent. However

Plaintiffs Affidavit and the Defendants own Affidavit of Sgt. Torres even states he was off the

wing at the time of the stabbing and that he was the only correctional officer assigned to the

wing. (Pls. Ex. 4- Affidavit of Richard Kough). As such the Defendants own evidence

corroborates the Plaintiffs allegations that he intentionally left the wing without securing the

doors, as required and as previously testified by Defendant Warden Cohen. Sgt. Torres also

admits in his affidavit he left the wing intentionally after an inmate told him to leave for his own

safety (again without securing all inmate cells down).  Although the Defendants suggest Sgt.

Torres was the only negligent employee in Plaintiff Kough's incident, there are several other

employees, including but not limited to the Major of Security, the Inmate Grievance Coordinator,

the contraband officer, and other correctional officers who were involved in this incident and

failed to follow proper policies and protocols.  Therefore there is evidence that the Defendants

were grossly negligent, including but not limited to Sgt. Torres, and genuine issues of material fact in dispute making summary judgment improper

**As to Plaintiff Priester**

The Defendants specifically argue that Ofc. Osbee was not grossly negligent. However in Plaintiff Preister's Affidavit he states he filed a Step 1 grievance on or about March 10, 2017 stating that he was stabbed 23 times by another inmate and that "no officer was inside of the wing when he got stabbed." (Pls. Ex. 6- Affidavit of Craig Priester). The Defendants also note in their Motion (ECF 87 pg. 4) that they do not dispute that a correctional officer was not standing inside the wing. Thus this provides further evidence that the Plaintiff's allegations are in fact accurate and SCDC and/or its employees was grossly negligent.  Therefore there is evidence that the Defendants were grossly negligent, including but not limited to Ofc. Osbee, and genuine issues of material fact in dispute making summary judgment improper

**As to Plaintiff Wilson**

The Defendants specifically argue that Ofc. Devin Williams was not grossly negligent. Warden Cohen's testimony, previously cited above, entirely refutes this statement. Warden Cohen testified that exactly what Officer Williams states he did in his Affidavit is a violation of SCDC's policies and procedures. See also Wilson's Affidavit in which he specifically states the officer left the wing. (Pls. Ex. 7- Affidavit of Joseph Wilson). Therefore there is evidence that the Defendants were grossly negligent, including but not limited to Ofc. Devin Williams and genuine issues of material fact in dispute making summary judgment improper.

**As to Plaintiff Littlejohn**

The Defendants specifically argue that Cpl. Cedric Major was not grossly negligent. However, again, the Defendants own Affidavit indicates that an SCDC employee was grossly negligent as he was not on the wing. Warden Cohen's testimony, previously cited above, also entirely refutes the Defendants arguments. Warden Cohen testified that exactly what Cpl. Cedric Major states in his Affidavit he did was a violation of SCDC's policies and procedures. See of Plaintiff Littlejohn's Affidavit in which he also states no officer was on the wing at the time of assault. (Pls. Ex. 5- Affidavit of Brian Littlejohn). Therefore there is evidence that the Defendants were grossly negligent, including but not limited to Cpl. Cedric Major, and genuine issues of material fact in dispute making summary judgment improper

**Specifically as to Plaintiff Taylor**

The Defendants specifically argue that Lt. Jenkins was not grossly negligent. Plaintiffs affidavit specifically stated that Lt. Jenkins failed to intervene when he was being assaulted thus evidence of gross negligence and creating a genuine issue of material fact and making summary judgement improper. (Pls. Ex. 8- Affidavit of Therl Taylor).The Defendants next argue there is no documentary evidence in support of the allegations raised in Plaintiff Taylor's complaint. This statement is ethically troubling. In fact there is ample documentary evidence which supports Plaintiffs allegations of failure to protect including: Plaintiffs expert report, Plaintiff's affidavit, and Taylor's grievances to name a few. (Plaintiff Taylor's grievances are also highlighted in Plaintiff's Affidavit- See Ex. 8).

Notwithstanding the above arguments, there is more than enough evidence including the Plaintiff's expert reports, previously cited deposition testimony, institutional Reports produced in

17

discovery, compliance audits produced in discovery, and third party reports (including the previously mentioned Roth Report) which dated back for years before these incidents advising the Warden and all SCDC employees that there are significant issues related to understaffing, violence, and security. (As one example see

e.g. https://www.postandcourier.com/opinion/commentary/commentary-sc-prisons-need-far-more-guards-and-far-more/article_0d444f4a-1394-11e9-b42f-e7fccc2aadc4.html).

Despite the above, the Defendants disregarded this information, failed to put in place the appropriate procedures, and continued to operate its facility in failure mode which lead to the foreseeable assaults. These actions of SCDC and/or its employees are so indifferent to the consequences of the Plaintiffs they constitute gross negligence. Under the circumstances, the Defendants had been on notice of the ongoing violence and reoccurring policy violations for years and it is beyond even slight care to: (1) leave the wings unattended; (2) fail to ensure compliance in all security measures; (3) fail to follow proper SCDC policies and procedures; (3) fail to ensure contraband is being properly controlled and monitored and (4) fail to ensure the safety and security of inmates within the SCDC. These most basic precautions should have been taken and were completed disregarded, as stated by our expert. Therefore there is evidence of SCDC's gross negligence and there are genuine disputes for trial. Therefore Defendants Motion for Summary Judgment must be denied.

The Defendants also argue that "it is undisputed that Warden Cohen was acting within the scope of his employment". However the Defendants have misconstrued Plaintiff's position to the Court. In fact what the Plaintiffs have alleged is that SCDC and/or its employees are liable for several actions that constitute gross negligence including:

a.  In allowing uncontrolled violence in the correctional institution;

b.  In failing to provide protection and security for the Plaintiff;

c.  In failing to properly train officers to respond to attacks such as occurred to the Plaintiff;

d.  In falling to have a sufficient number of trained correctional officers to adequately respond to incidents such as what occurred to Plaintiff;

e.  In employing employees who were contributory to the violence in the prison;

f.  In failing to comply with SCDC policies and procedures regarding correctional officers remaining on their assigned wings until relieved by another correctional officer, and by allowing the said violation to occur without taking corrective action and without punishment to any correctional officer who violates the same;

g.  In allowing inmate to have dangerous weapons;

h.  In failing to conduct sufficient and appropriate inspections of the dorms to prevent inmates from obtaining weapons;

i.  In violating the separation policy by housing the inmates who have had prior problems in the same institutions and/or dorms and/or wings;

j.  In violating the classification policy by placing the inmates who are not properly classified in the same room (cell), dorm or wing;

k.  In failing to provide necessary, appropriate and proper medical and mental health care to the inmates;

l.  In failing to punish and correct instances of weapons possession after an inmate is apprehended with or uses a weapon;

m.  In failing to discipline its correctional officers for violations of SCDC policies and procedures;

n.  In negligently supervising its employees by failing to provide proper training in investigating, searching for and preventing inmates from obtaining and possessing dangerous weapons:

o.  In committing acts and/or omissions where Defendants knew or should have known that such acts and/or omissions would allow or facilitate inmate on inmate attacks, beatings, stabbings and robbery of other inmates;

p.  In failing to properly investigate the complicity of correctional officers and/or

their participation in a culture that allows certain individuals (inmates) to be targeted and harmed;

q.   In allowing, without punishment, violent acts to occur in the correctional institution thereby creating a culture of violence;

r.   In allowing, after notification, robberies, beatings, stabbings, possession of contraband weapons, and other violations to occur by "turning a blind eye" to such violations and failing to take corrective actions to prevent such violations;

s.   In preparing weekly, monthly, quarterly, and/or yearly reports which detail incidents of violence, such as, but not limited to, robberies, beatings, stabbings, possession of contraband weapons, and other such violations, which show the need for corrective actions and not taking the appropriate corrective actions;

t.   In failing to prosecute all violations of the law in reference to the treatment of convicts as mandated by South Carolina law;

u.   In such other particulars as the evidence at trial will show.

(See Plf. Amended Compl. ¶123).

Additionally the Plaintiffs have also alleged that Warden Cohen is liable individually under 42 U.S.C §1983. (See Plf. Amended Compl. ¶111-121). As such any actions by Warden Cohen, within his scope of employment would fall back on SCDC for liability and any actions by Warden Cohen that have been alleged to be constitutional violations and individual by Warden Cohen would still make him personally liable under 42 U.S.C §1983[4]. Therefore the Defendants are not accurate in their statement to the Court that it is undisputed that Warden Cohen was only acting within the scope of his employment at all times alleged in Plaintiffs Complaint.

## II.   PLAINTIFFS HAVE OFFERED PROOF OF THE ELEMENTS REQUIRED TO STATE A *PRIMA FACIE* CASE OF 42 U.S.C. § 1983.

To state a claim under 42 U.S.C § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was

---

[4] Plaintiffs arguments for Defendant Warden Cohen's liability under 42 U.S.C §1983 are detailed below in Section II of this Memorandum in Opposition.

committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). Here, the Plaintiffs allege the Defendants failed to protect the Plaintiffs from violence in violation of the Plaintiff's Fifth, Eighth, and Fourteenth Amendments. The Eighth Amendment to the United States Constitution expressly prohibits the infliction of "cruel and unusual punishments," and imposes a duty on prison officials to provide humane conditions of confinement, including the protection of inmates from violence at the hand of their fellow inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994); see also Makdessi v. Fields, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety."). Thus, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Id. at 828. The Fourteenth Amendment forbids any state to deny any person "life, liberty or property, without due process of law". The Defendants generally argue that the Plaintiff has failed to produce any evidence of deliberate indifference. The Plaintiffs disagree.

The Plaintiffs claims for violations cruel and unusual punishment are based on Defendant Warden Cohen's deliberate indifferent actions in failing to ensure health and safety of the Plaintiffs, in subjecting the Plaintiffs to bodily harm, and allowing them to be in an uncontrolled violent environment despite having knowledge that it would subject them to harm. The Plaintiffs Fourteenth Amendment claims seek redress for acts that violate personal immunities that are fundamental to the Plaintiffs. A Due process claim brought by prisoners can be based on deprivations caused by the government's failure to train, supervise or adequately hire its employees as well as cruel and usual punishment and require a showing that the government's inaction was a custom, policy, or practice, and that the government's deliberate inaction caused the injuries. (See *City of Canton v. Harris*, 489 U.S. 378, 388 in which the court has required a

plaintiff to show that the type of incident which resulted in injury is recurring as to tend to show that the government's inaction was conscious or deliberate, amounting to "deliberate indifference" to the consequences of its inaction).

Here, there is evidence that the actions of Defendant Warden Cohen violated the rights of the Plaintiffs and thus these actions were deliberate and not within the discretionary function of the employees. Additionally there is evidence that the Defendants actions have established a pattern, practice, custom within SCDC based upon the fact that prisoners have been grieving about these same issues for years[5], that SCDC has been on notice of the violent assaults and policy violations for a long time and still has yet to remedy the underlying situation. In fact at minimum there is at least seven incidents (all of the Plaintiffs) in this case which show the pattern, practice, and custom of SCDC. All of these incidents occurred because of the same policy violations and reoccurring actions by the Defendants.  The Reports and Affidavit of James Evan Akin also provide a good summary of how gang inmate violence has been on ongoing problem at SCDC for years. (See Plf. Ex. 2, 3, and12). The Court can also take judicial notice that SCDC has been sued *over 160 times* since 2015 for allowing uncontrolled gang violence in SCDC.

> Inmates complained in lawsuits that South Carolina's prisons are home to "uncontrolled violence," where there are far too few guards, cells are left unlocked and gangs "run free and commit whatever crimes they want within the institution without fear of punishment," according to some of the 160-plus lawsuits filed against the state Department of Corrections since 2015.
>
> https://www.usatoday.com/story/news/2018/04/30/prison-riots-and-killings-rising-states-slash-budgets-guards/545299002/

In short, the uncontrolled gang violence at SCDC *is an on-going* problem that is well known and has been well known to the Defendants since at least 2015. Thus there is evidence that a pattern,

---

[5] This case alone includes over a years time frame of similar grievances.

practice, and custom has been established within SCDC making all of the Plaintiffs constitutional claims proper.

As noted above Plaintiff's expert opines that the actions of Defendant Warden were deliberate indifferent to the Plaintiff's constitutional rights. He specifically notes that the Warden was on notice and that he had actual knowledge of these system failures yet failed to take the necessary precautions to fix the problems which in turn caused the plaintiffs incidents to occur. Plaintiffs expert also opines that based upon the knowledge available to the Warden his actions were deliberately indifferent because:

> "There is the absence of basic necessary actions by Defendants to reasonably plan, establish measures, or reasonably address the blatant security failures that would have objectively ensured the safety of the Plaintiffs. The primary purpose of continual planning, and monitoring by Defendants is to prevent, detect, respond and contain security issues prior to the occurrence of a critical event. The life endangerment critical events assessed in this proceeding give clear and precise evidence that instead; Defendants have abdicated their responsibilities to reasonably protect the Plaintiffs. There is a direct causal relationship between the abdication of Defendants responsibility and the life endangerment critical events discussed in this report."

> "the Defendants deliberate failures which caused the security life endangerment critical events that I identified in my original report. Specifically, I was asked to evaluate the Defendants' actions and or lack of actions in regard to their authority, duties and responsibilities to determine what Defendants should have done to reasonably prevent, detect, respond and contain the security failures and misconnections that caused the critical events."

(Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report).

Plaintiffs expert goes even further and gives examples of the deliberate indifferent actions by Defendant Warden Cohen and states he knew of these basic principles and should have implemented them into SCDC:

**Example #1:**

"**Principal:** Prison officials must develop reasonable, objective, and validated measures and policies that have a direct causal relationship to objectively produce a reasonably safe environment for inmates, staff and the community.

Defendants are required to ensure that each decision, indicator, policy and/or measure is designed to proactively prevent, detect, contain and mitigate security issues that may cause a life endangerment critical event. The facts, as represented above, placed Defendants on specific and validated notice to a reasonable degree of certainty that the Plaintiffs were placed in life endangerment peril while each person was under the Defendants' custody and control. The Defendants were required to establish, operationalized and monitor these systems to determine the level of required outcome productivity. (i.e. inmates not being physically assaulted with or without weapons as well as the deployment of staff, physical barriers, and the appropriate supervision of inmates which reasonably circumvents random and systemic violence at the prison). Basic sight and sound supervision, gang management and contraband control systems were in critical failure mode based upon the above referenced facts. As a result, Plaintiffs had to endure needless life endangerment perils due to the deliberate indifference and gross negligence of the Defendants to employ elementary sound prison abatement measures to reasonably control these life endangerment critical events."

**Example #2:**

**Principal:** Prison officials must take responsibility and exercise their authority to ensure the safety of staff, inmates, and the community.

Discussion: The following is an example of a reasonable approach the Defendants should have taken to logically address the security critical issues.

*Examples of Specific Problem Statements Defendants should have establishe*d:

A. Starting in at least March 2016, there is the recovery of contraband weapons that can and will be used by inmates and/or groups of inmates to cause random and systematic prison violence. There is a clear validation that the contraband control as well as inmate supervision and gang management systems are in failure mode. Inmate population can:

1. Collect raw materials to retro fit into a weapon unabated by prison staff.
2. Transport the raw material to a location unabated.
3. Retrofit the raw material into a weapon.

Starting at least in April 16, 2016, inmate population were allowed unabated to take weapons to a prison location and inflict life endangerment violence upon other inmates. (Note: It is noted that contraband weapon (knives) professionally manufactured in the community have been recovered).

24

(Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report).

The Plaintiffs expert concludes:

> In a confinement operational context, the Defendants, South Carolina Department
> of Corrections and Defendant Warden Levern Cohen were deliberately
> indifferent, callous, wanton, and grossly negligent in not adhering to basic
> confinement responsibilities and utilizing their authority to protect Messrs.
> Richard Kough, Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor,
> Roy Sutherland and Joseph Wilson. Defendants were grossly negligent,
> deliberately indifferent and clearly failed to provide Messrs. Richard Kough,
> Brian Littlejohn, Craig Priester, Sterling Harley, Therl Taylor, Roy Sutherland
> and Joseph Wilson with basic sight and sound supervision, gang management and
> contraband control provisions that would, to a reasonable degree of certainty,
> avoided these life endangerment critical events

(Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report).

 Defendant Warden Cohen even testified that he reviews the contraband reports, has

weekly briefing regarding the ongoing issues of security in his facility, reviews inmate grievances

regarding assaults and criminal activity, and reviews the compliance audits (which indicate several

"non compliant" sections). Thus Defendant Warden did have knowledge about the ongoing failure

mode that Ridgeland Correctional was in and knew these assaults would occur:

> 1 with my executive staff on that Monday morning and
> 2 they will give me a briefing on what has been
> 3 going on since I've been gone. Anything that --
> 4 if imminent needs my direct immediate attention,
> 5 they will let me know. So they would brief me on
> 6 everything. And then we have an on call official
> 7 for that week. And they would be the one what
> 8 give me in-depth information as to what transpired
> 9 that whole seven days.
> 10 Q What would be the key things that they
> 11 would highlight on? You know, would it be these
> 12 incidents happened, this contraband was
> 13 confiscated, what types of things would be the
> 14 main things you would want to know?
> 15 A Count -- if the count didn't clear.
> 16 What was the reason why the count did not clear on
> 17 time. Contraband issues, if cont--- as if

18 contraband was found what type of contraband,
19 where was it found, who -- what inmates were
20 involved. Any disturbances or -- or major
21 assaults. I would have to be briefed on that.
22 Any breaches through our perimeter, those type
23 issues.

(See Plf. Ex. 9C) (Depo of Warden Cohen 44: 1-23).

7 Q After Lieutenant Mole compiles all
8 these documents and starts to create his report,
9 what happens next? Do you -- does he sign off and
10 then it goes to someone else, or does it
11 eventually get up to you? What's kind of the
12 chain?
13 A It goes from -- from -- he makes a
14 report to myself and the executive staff. The
15 report is kept here on file and a report is sent
16 to division of security.

(See Plf. Ex. 9D) (Depo of Warden Cohen 56: 7-16).

21 Q Have you found any instances where the
22 guards or the C.O.'s are actually bringing in the
23 contraband?
24 A I've had incidences, yes.

(See Plf. Ex. 9E) (Depo of Warden Cohen 61: 21-24).

4 Q How -- how else do those folding knives
5 get in besides being thrown over?
6 A We have a -- again, staff that may have
7 fall for those games and may have brought them in.
8 We have vehicles. We have a prison industry where
9 we have large tractor trailers coming in. Those
10 vehicles are searched, but due to their size and
11 hiding compartments on some of those larger
12 vehicles, there are sometimes that items are
13 missed. So either they came through our front

26

14 lobby, or they came through our vehicle gate, or
15 they came over the fence at this time.

(See Plf. Ex. 9F) (Depo of Warden Cohen 66: 4-15).


13 Q So you are advised of all findings of
14 what contraband is confiscated?
15 A Yes, ma'am.

(See Plf. Ex. 9G)(Depo of Warden Cohen 96: 12-15).


15 Q Okay. Now I want to talk about – a
16 little bit about the grievance process and the
17 grievance procedure. I believe I have the policy.
18 Generally, are you involved in the inmates'
19 grievance process and procedure?
20 A Generally, yes.
21 Q What is your role?
22 A To review the grievance once it comes
23 from the grievance coordinator to have a response
24 ready for that grievance.

(See Plf. Ex. 9H) (Depo of Warden Cohen 77: 15-24).

Defendant Warden Cohen has had information for years preceding these incidents such as tons of

similar grievances involving correctional officer negligence, and notice of the increase of inmate

on inmate assaults.  He also testified he is directly involved in requesting investigations of

inmate on inmate assaults. So he would have knowledge of these incidents and prior incidents

which suggest the pattern, practice and trend within SCDC.


20 Q Are you involved at all in the
21 investigation pro--- procedures and oversight of
22 when an investigation needs to occur after an
23 incident?
24 A I can request an investigation.
25 Q And when would you do that?

27

(See Plf. Ex. 9I) (Depo of Warden Cohen 88: 20-25).

    5 Q What would be an example of an inmate
    6 on inmate attacks that would warrant you to
    7 request an investigation?
    8 A Due to the serious injury.
    9 Q Okay. What would you define as a
    10 serious injury?
    11 A Physical assaults or stabbings.

(See Plf. Ex. 9J) (Depo of Warden Cohen 91: 5-11).

    9 Q So you would have to specifically
    10 request one for an inmate on inmate?
    11 A Yes.

(See Plf. Ex. 9K)(Depo of Warden Cohen 92: 9-11).

    13 Q As the lieutenant of contraband, do you have
    14 any responsibility or duty to assist the
    15 facility in how to manage the gangs, and do
    16 you have any role in implementing policies of
    17 those sorts to help manage these individual
    18 gangs?
    19 MR. HARTE: Object to the form.
    20 THE WITNESS: I just gather the intel,
    21 advise the warden of the situation.

(See Plf. Ex. 11) (Depo of Lieutenant Mole 26:13-21)).

Therefore contrary to the Defendants argument that the Plaintiffs have failed to produce

any evidence of deliberate indifference there is in fact ample evidence to support the Plaintiffs 42

U.S.C §1983 claims making summary judgement improper. The Plaintiffs have sufficiently

established: all the Plaintiffs were incarcerated under conditions posing a substantial risk of

serious harm, have received a serious physical injury resulting from these conditions, and that the

Defendants acted deliberately indifferent to the Plaintiffs health or safety by consciously disregarding a known risks of serious harm. [6]

The Defendants further argue that Defendant Warden Cohen is entitled to qualified immunity. As stated above the actions of Defendant Warden Cohen violate clearly established rights of what a reasonable person would have known and there is evidence that Warden Cohen in fact did have notice and knowledge of the very issues that occurred in these incidents. There is also evidence that Warden Cohen was personally involved in all aspects of the Plaintiffs incidents from the grievances that were filed and ignored, from the investigations that either never took place or were not fully completed, his deliberate lack of control and supervision, among a variety of other failures in which Plaintiffs expert has opined were casually contributed to all of these incidents. Thus Warden Cohen cannot claim a qualified immunity as a defense.

Defendants argument for Eleventh Amendment Immunity is also unfounded. One exception to the Eleventh Amendment Immunity is consent to jurisdiction. In this case the Defendants voluntarily removed this case to federal court, after it was originally filed in state court, and thus consented to jurisdiction in this court.

For the above reasons Defendants Motion for Summary Judgement must be denied.

### III.    POST HOC, ERGO PROPTER HOC" AND "RES IPSA LOQUITOR." IS NOT APPLICABLE TO THIS CASE.

The Defendants argue that the Plaintiffs contention that SCDC and Warden Cohen are responsible based upon the maxims of "post hoc, ergo propter hoc" and "res ipsa loquitor". Contrary to the Defendants argument, the Plaintiffs are not solely relying on the fact that an

---

[6] The Defendants also make an argument for constitutional violations on behalf of Lt. Housey. (See ECF #82). However Lt. Housey is not a named Defendant in this case nor has any of the Plaintiffs alleged constitutional violations against Lt. Housey.

incident occurred and thus the Defendants are liable. The Plaintiffs are also not relying on the sole fact that because inmate are incarcerated that they may be assaulted as the Defendants suggest. Rather there is a magnitude of evidence which supports Plaintiff's allegations and has already been highlighted above in Sections I and II.

Plaintiff's expert also specifically explains the causal links between the incidents alleged in the Complaint and the liability on behalf of Defendant Warden Cohen and SCDC in extreme detail throughout his reports. (Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report). For example Plaintiffs Expert has a section called "The Relationship of the Principal to the Series of Critical Events" where he explains each principle the Defendants should have done, the relevant facts in our case, and provides a discussion on why the principle needed to be implemented, that it was not implemented in any of the Plaintiffs incidents, and that's why the Plaintiffs incidents occurred. (Pls. Ex. 2)( Plf. Expert Report)(Pls. Ex. 3)(Plf. Expert Supplemental Report). Plaintiffs expert also relies on thousands of discovery documents produced by the Defendants to support these opinions. (See pg. 22 and 23 of Plf. Expert Report). Thus, Defendants argument that the Plaintiffs are relying on the mere fact that incident occurred is absurd. Defendant Motion for Summary Judgment must be denied.

## IV.    PLAINTIFFS HAVE ESTABLISHED THE ELEMENTS NECESSARY FOR INJUNCTIVE RELIEF.

The Defendants argue that the Plaintiffs have failed to establish any of the elements necessary for injunctive relief. Defendants specifically argue the Plaintiffs have an adequate remedy at law and thus injunctive relief is not needed. However the Plaintiffs do not have an adequate remedy in law for monetary damages. The crux of the Plaintiffs allegations goes to the

inadequate safety and security that SCDC is providing to the Plaintiffs. The Plaintiffs affidavits

indicate they are still in fear for their lives. For example they state:

> Preister states: "10.I am fearful for my life and have has several threats on it that I have told SCDC employees about".

> Wilson states: "10.I am fearful for my life and have had several threats on it that I have told SCDC employees about. Still they fail to act to properly protect my life."

> Kough states: "10. I am fearful for my life and have has several threats on it that I have told SCDC employees about."

> Taylor states:  "10. I am fearful for my life and have has several threats on it that I have told SCDC employees about."

Additionally Plaintiff agrees that since Brain Littlejohn is now out of SCDC custody, he may not

have a claim for injunctive relief at this time. Defendants' argument are also flawed in that

money damages will not adequately protect the lives of these individuals in the future. Money

does not eliminate the current threats these Plaintiffs face. The Plaintiffs have been previously

assaulted due to the failures of the Defendants. Additionally Plaintiff's expert also states if the

Defendants do not fix failure mode these assaults and violence will only continue to occur. (See

Plf. Exhibit 2 and 3). In fact the pattern, practice, and custom that has been established also

provides evidence of this statement. Thus monetary relief is not an adequate remedy at law to

ensure the continued protection of the Plaintiffs. Failing to provide injunctive relief to the

Plaintiffs despite having threats on their lives, with a high rate of contraband and violence

occurring in SCDC, with understaffing issues prevalent would most definitely result in

irreparable harm. In sum, there is expert evidence which establishes irreparable harm is not just a

possibility but rather a foreseeable event: "If decisive, objective, cause and effect measures are

not taken, the advent of additional life endangerment critical events will continue." (See Plf. Ex.

2).

Second, the Defendants argument that the Plaintiff must file a verified Complaint is confusing. An exception, as cited by the Defendant, states that if the action has already been commenced by filing and service of the summons and complaint then pleadings need not be verified or accompanied by an affidavit. In this case there is already a filed and served summons and complaint

Third, the Defendants arguments that injunctive relief is moot upon transfer of the Plaintiff is also illogical in this instance. SCDC is comprised of thirteen different facilities and a variety of different gang members who are housed all around the state. Solely because a Plaintiff is transferred from one intuition to another does not mean that the threats by the gang members vanish. Additionally the SCDC failures alleged by the Plaintiffs are not just Ridgeland related; they are systemic and system wide issues. The same reoccurring policy violations, illegal contraband assaults, and gang member activity are happening at Lee, Leiber, Evans, Broad River, and a variety of other SCDC intuitions. SCDC can also change an inmate classification at any given time by moving him out of protective custody into general population, out of RHU, change his cell, change his dorm or wing, and thus granting injunctive relief will ensure that no matter where SCDC decides to place the Plaintiffs their safety and security will be preserved. Thus Plaintiffs Amended Complaint and injunctive relief causes of actions are proper.

V.    **DEFENDANTS MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE MATERIAL QUESTIONS OF FACT EXIST AS TO WHETHER THE <u>INMATE</u> <u>GRIEVANCE SYSTEM</u> REMEDIES WERE AVAILABLE TO THE PLAINTIFFS.**

A.    **Defendants summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiffs to attempt to informally resolve their criminal activity complaints since the Inmate Grievance System does not require this.**

The Defendants initially contend that they are entitled to summary judgment because the Plaintiffs failed to informally resolve their complaints about correctional officers allowing inmates to attack the Plaintiff:

> Pursuant to South Carolina Department of Corrections policy, in order to complain of prison conditions, each prisoner must first attempt to informally resolve his complaint. See Anderson affidavits generally and SCDC Policy/Procedure GA-01.12, generally, and specifically section 13.2. In each of the seven (7) cases here, the prisoners have failed to informally attempt to resolve their respective complaints. See Anderson affidavits generally.

(Defendants' memorandum in support of motion for summary judgment). This argument is not only meritless but is ethically troubling. Inmate Grievance Coordinator Sheldon L. Anderson has misrepresented the Inmate Grievance System to the Court. As the Inmate Grievance System clearly provides, informal resolution is not "appropriate" with regard to complaints about criminal activity:

> Inmates must make an effort to informally resolve a grievance by submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days. However, in certain cases, informal resolution may not be appropriate or possible (e.g. when the matter involves allegations of criminal activity)….If informal resolution is not possible, the grievant will complete Form 10-5, Step 1 which is located in common areas, i.e., living areas, libraries etc., and will place the form in a designated grievance drop box within five working days of the alleged incident.

(Pls. Ex. 1)(Inmate Grievance System, para. 13.2). To the contrary, as previously noted, when allegations of criminal activity are involved (such as they are here), the inmate is required to file a Step I grievance which "immediately" is referred to the Inmate Grievance Chief and the Division of Investigations. (Pls. Ex. 1)(Inmate Grievance System, para. 15). As the Plaintiffs' expert James Evan Akins has previously explained:

> "My experience reveals that the unfortunate occurrences, such as the assaults and attempted murders that occurred to each of the named Plaintiffs, serve as key indicators and warnings which reveal that the grievance delivery system is dysfunctional and not generating the intended productivity of protection and safety. As a result, the inmate

> population becomes distrustful and fearful of the grievance system and the staff…., In my professional opinion, in each of the Plaintiffs incidents there is a general theme of failures that present extreme barriers to the grievance process. These include, but not limited to: (1) improper guidance to inmates from prison staff regarding grievances; (2) unavailability, intimidation, threat of physical attack and violence towards inmates as well as discouragement by staff towards inmates that wish to file grievances, (3) correctional staff participating in gang activity with inmates, (4) the absence of appropriate confidentiality in the grievance process which further facilitates intimidation and violence upon the inmate that wishes to file a grievance, and (5) correctional staff violating policies and procedures which also creates the perilous origination of violence and threats. These Plaintiffs, in a prison operational context, had a reasonable intense and legitimate fear of intimidation, violence and retaliation, at the hands of SCDC employees and/or other inmates for grieving their endangerment perils…a grievance system cannot be deemed "available" as required by the PLRA if factors such as the above are present within an internal grievance system."

(Pls. Ex. 12)(Affidavit of James Evan Aiken, para. 17, 18).

Accordingly, Defendants summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiffs to attempt to "informally" resolve their criminal activity complaints. Viewing the evidence in the light most favorable to the Plaintiffs, informal resolution is not required with respect to the criminal activity which, is the subject of the Plaintiffs' lawsuit (assaults by gang members).

**B.     Defendants summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiffs to attempt to file Step I and II grievances because material questions of fact exist as to whether these remedies were "available".**

The Prison Litigation Reform Act does require an inmate to exhaust all *available* administrative remedies prior to filing a 42 U.S.C. § 1983 action arising from prison conditions:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). As previously noted, the Inmate Grievance System requires inmates complaining of criminal activity to file a Step 1 grievance within five days of the incident, and a

Step 2 grievance if he is dissatisfied with the resolution of his grievance. But such filing is necessary to exhaust remedies only if these remedies are "available" in the particular case.  An inmate need not exhaust administrative remedies that effectively are "unavailable" remedies, not withstanding that they are listed in the prison grievance policy.

The United States Supreme Court has defined "available" administrative remedies in this context as those remedies that are capable of use to obtain some relief for the action complained of:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust—although significantly different from the "special circumstances" test or the old CRIPA standard—has real content. As we explained in Booth, the ordinary meaning of the word "available" is " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' "
>
> 532 U.S., at 737–738, 121 S.Ct. 1819 (quoting Webster's Third New International Dictionary 150 (1993)); …Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of." Booth, 532 U.S., at 738, 121 S.Ct. 1819.

Ross v. Blake, 135 S.Ct. 1850, 1858-59 (2017). The Court has identified three categories where administrative remedies, although on the books, are not "available" within the meaning of the statute. First, an administrative procedure is "unavailable" when correctional officers are unable, or unwilling, to provide any relief to the inmate:

> First, … an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates….. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In Booth 's words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." … So too if administrative officials

> have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." … When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

135 S. Ct at 1859. Second, an administrative procedure is "unavailable" when it is so confusing no reasonable prisoner can make sense of what it demands:

> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solicitor General put the point: When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available." Tr. of Oral Arg. 23. …When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. …Accordingly, exhaustion is not required.

135 S. Ct at 1859.

The third category encompasses circumstances where prison officials through machination, misrepresentation, or intimidation prevent the inmate from taking advantage of a grievance process:

> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In Woodford, we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." 548 U.S., at 102, 126 S.Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable.3 And then, once again, § 1997e(a) poses no bar.

135 S.Ct. at 1860. <u>Custis v. Davis</u>, 851 F.3d 358 (4th Cir. 2017). As will be seen, to the extent that any Plaintiff failed timely to file a Step 1 or Step 2 grievance, these remedies were "unavailable" within the meaning of one, or more, of the foregoing three exceptions.

36

As the Fourth Circuit has explained, a grievance need only be sufficient to alert a prison to the nature of the wrong for which redress is sought:

> The main purpose of the PLRA's exhaustion requirement is "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Moore, 517 F.3d at 726 (internal quotation marks omitted). Accordingly, to satisfy the exhaustion requirement, grievances generally need only be sufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought." Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002).

Wilcox v. Brown, 877 F.3d 161, note 4 (4th Cir. 2017). The grievances filed thus easily met the standard required for exhaustion. Further, even if the Plaintiffs did not in their grievances seek specific remedies and/or policy changes designed to prevent reoccurrence of inmate attacks, such failure would not make his grievances insufficient. As the Seventh Circuit has explained, no prison system may require the prisoner to specify each remedy later sought in litigation:

> Thus, for example, no administrative system may demand that the prisoner specify each remedy later sought in litigation — for Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), holds that § 1997e(a) requires each prisoner to exhaust a process and not a remedy. No comparable doctrine prevents a prison system from requiring factual particularity in an internal grievance.

David v. Strong, 297 F.3d 646, 649-50 (7th Cir. 2002).

Prisoners who are functionally unable to exhaust their claims through no fault of their own may be excused from the PLRA exhaustion requirement. *See, e.g., Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016); *Williams v. Paramo*, 775 F.3d 1182 (9th Cir. 2015); *Nunez v. Duncan*, 591 F.3d 1217, 1224–26 (9th Cir. 2010) ("We hold that Nunez's failure to timely exhaust his administrative remedies is excused because he took reasonable and appropriate steps to exhaust his Fourth Amendment claim and was precluded from exhausting, not through his own fault . . . ."). In other words, we have recognized that the PLRA does not require exhaustion when

circumstances render administrative remedies "effectively unavailable." *Nunez*, 591 F.3d at 1226.

Generally, the Defendants argue that the Plaintiffs did not exhaust their administrative remedies complaining about the assaults they suffered and are entitled to Summary Judgment. Nonetheless, the Defendants are still not entitled to summary judgment because material questions of fact exist as to whether the Defendants and/or their servants, agents, or employees through machination, misrepresentation, or intimidation prevented them from taking advantage of the grievance process. In particular, the Plaintiffs contend that they did not file grievances because they either: had a reasonable fear of suffering retaliation if they did so or they are excused because they attempted to take reasonable and appropriate steps to exhaust their but were intentionally precluded from exhausting, not through his own fault, but through the fault of the Defendants, and/or the grievance system was unavailable to the Plaintiffs as defined by the Courts.

Mary Montouth was in the inmate grievance coordinator at the time of the incidents alleged in the Complaint. In her deposition she further clarifies that inmates are not required to informally resolve (file a Request to Staff Form) grievances that allege criminal activity prior to filing a Step 1 grievance:

> 24 Q So if they have an issue with -- they're
> 25 appealing their disciplinary, they don't have
> 1 to do a request to staff, they can just start
> 2 on Step 1?
> 3 A Right. After the disciplinary hearing, they
> 4 have five days to appeal it if they want to.
> 5 Now, okay, criminal activity, okay, they don't
> 6 have to do an appeal on that. I mean, they
> 7 don't have to do an informal resolution on
> 8 that
> 9 Q And what do you mean by criminal activity

10 A Okay. If an inmate is involved in -- say he
11 got beat up, okay, or he is alleging – PREA
12 is another that they don't have to do an
13 informal resolution.
14 Q So they --
15 A Any criminal activities.
16 Q I see. Any criminal activity. So then they
17 could -- they don't have to do the request to
18 staff, they can just go right to Step 1?
19 A Yes.
20 Q So if there are any request to staff forms
21 that are filled out by an inmate for, say, an
22 assault or they got beat up or something, and
23 they filled out a request to staff form first,
24 just say hypothetically --
25 A Okay.
1 Q -- instead of going to the correct procedure
2 to just filling out the Step 1, and the
3 request to staff form was -- well, let me
4 start over.
5 So hypothetically, for example, let's say
6 an inmate was involved in an assault or got
7 beat up, that would be a criminal activity,
8 correct?
9 A Yes.
10 Q So according to policy, they're not required
11 to fill out a request to staff form, right?
12 A Exactly.
13 Q They can go right to Step 1?
14 A Right.
15 Q So, for example, an inmate fills out a Step 1,
16 but then it's returned to them and denied
17 stating you didn't fill out a request to staff
18 form, would that be improper policy?
19 A Depends upon the grievance, you know, depends
20 upon what it is, what happened. But normally,
21 if a criminal activity is done -- I can only
22 speak for myself -- what I'll do, I'll send it
23 up to the inmate grievance branch to
24 Mr. Anderson for review.

(See Plf. Ex. 13A) (Depo of Mary Montouth 18-20: 24-25, 1-24, 1-24).

39

Ms. Montouth also further explains the proper policy for referring grievances that allege

"criminal activity".  In sum she states a grievance that says someone is beat up or stabbed is

criminal, does not need informal resolution, and should get referred to Mr. Anderson.

> 20 Q So would it be safe to say that Step 1s that
> 21 come in that are determined to be criminal
> 22 automatically get referred to Mr. Anderson, or
> 23 should automatically get referred to
> 24 Mr. Anderson?
> 25 A They should, for review. Alleging criminal
> 1 activity should be sent.
> 2 Q Now, who makes the determination that the
> 3 grievance is alleging criminal activity?
> 4 A Actually, the grievance coordinators. If you
> 5 get -- if I get a grievance -- now, I can only
> 6 speak for myself. If I get a grievance and I
> 7 see where he was beat up or what have you, he
> 8 was stabbed, I send it up to Mr. Anderson for
> 9 review.
> 10 Q So as soon as you see stabbing occurred, "I
> 11 was stabbed," you send it to Mr. Anderson?
> 12 A Yes.
> 13 Q And that would be proper policy, correct?
> 14 A Right, correct.

(See Plf. Ex. 13B) (Depo of Mary Montouth 20-22:10-24, 1-14).

Ms. Montouth also clarifies that medical issues are not "grievable issues" under SCDC policy.

> 9 Q Well, Ms. Montouth, my question is still a
> 10 little bit unanswered, and what I'm trying to
> 11 figure out is do you agree that this policy,
> 12 under grievable issues, does not notate that
> 13 medical is grievable?
> 14 A Yes.
> 15 Q But you're still saying that inmates file some
> 16 grievances in regards to medical, right?
> 17 A Yes.
> 18 Q But the policy does not require them to file
> 19 any grievances in regards to medical. Isn't
> 20 that right?
> 21 A That's right.

(See Plf. Ex. 13C) (Depo of Mary Montouth 26: 9-21).

Therefore any medical issues alleged in Plaintiff's Complaint should not be dismissed for failure to exhaust administrative remedies. (See Plf. Compl. ¶18, 21, 93, 104, 108, 112(k), 123(k)). Ms. Montouth also agrees with the Plaintiffs arguments that if the officers do not get the Plaintiffs grievance forms then they would not have access to the grievance system. She also states that Plaintiffs will not be given a Step 2 form unless a Step 1 has been processed and that these forms can only be distributed through the inmate grievance coordinator:

> 17 Q Well, again, my original question was if
> 18 they're in lockdown, right, you said they're
> 19 dependent on the correctional officers to get
> 20 those forms, right?
> 21 A Right.
> 12 Q Well, my example was if the officers did not
> 13 get them the forms, then they would not have
> 14 access to the grievance system. Wouldn't that
> 15 be right? How else would they be able to get 16 the forms?
> 17 A Yes.

(See Plf. Ex. 13D) (Depo of Mary Montouth 29-30:17-21,12-17).

> 8 Q Where else can an inmate get a Step 1 or a
> 9 Step 2 form?
> 10 A He can request one through me. Now, they will
> 11 not get a Step 2 unless a Step 1 has been
> 12 processed.

(See Plf. Ex. 13E) (Depo of Mary Montouth 41-42:14-25, 1-12).

### a. As to Plaintiff Richard Kough

According to Inmate Grievance Coordinator Anderson, Plaintiff Kough failed to exhaust his administrative remedies. Mr. Anderson asserts:

> 8. Based upon my review of the available records, Plaintiff submitted a Step 1 grievance, RCI- 0355-16, on July 21, 2016. Alleging there was no correctional officer for the Savannah Housing Unit, B wing, "even though [the inmates] were let out of [their] cells anyway." Plaintiff goes on to allege that he was attacked, beaten, and stabbed because there was no correctional officer there to protect or help him. The Inmate Grievance Coordinator replied on September 14, 2016,

informing Plaintiff that his grievance was being held in abeyance pending an investigation by SCDC's Police Services division. On September 20, 2016 Plaintiff's Step 1 grievance was returned to him because he failed to properly complete the grievance by seeking an informal resolution.  Plaintiff did not thereafter file any other grievances about this matter.

9. Based upon my review of the available records, at no time did Plaintiff file a Step 2 Grievance regarding his complaints for failure to protect from inmate on inmate violence.

10. Based upon my review of the available records , at no time did Plaintiff file an appeal to the South Carolina Administrative Law court regarding his complaints of failure to protect from inmate on inmate violence.

11. Based upon my review of the available records, at no time did Plaintiff make an attempt to informally resolve a grievance by submitting a Request to Staff Member (SCDC Form 19-11] or a RTSM through the kiosk to the proper staff member regarding his complaints of failure to protect from inmate on inmate violence.

(Pls. Ex.14) Affidavit of Sheldon L Anderson, para. 8, 9, 10,11).

As previously noted, Plaintiff Kough was not required to informally resolve his grievance about the criminal beating he suffered. Nor does the <u>Inmate Grievance System</u> require an inmate to request protective custody. Hence, these assertions do not entitle the Defendants to summary judgment.

With respect to Plaintiff Kough's failure to timely file a Step 1 and Step 2 grievance, this failure is excused for purposes of summary judgment insofar as material questions of fact exist as to why Plaintiff Kough failed to file these grievances. Specifically Plaintiff Kough states:

11.     On or about July 9, 2016, I was assaulted by a gang members with illegal contraband weapons when the officer on duty left and/or abandoned his post and/or failed to intervene, despite prior notice, in violation of SCDC polices.
12.     I filed a Step 1 grievance.
13.     On September 14, 2016, I received a response from the Inmate Grievance Coordinator telling me that my grievance was being held in abeyance pending an investigation by SCDC's Police Services Division.  But then on September 20, 2016, my grievance was returned to me unprocessed because SCDC said I did not

file an informal resolution (Request to Staff) which I understand is not necessary
when the matter being grieved is a criminal matter.

14.      Since my Step 1 grievance was returned to me unprocessed, I was not
given a Step 2 grievance form by the Inmate Grievance Coordinator.  Step 2
grievance forms are not available except from the Inmate Grievance Coordinator
when the Step 1 grievance is denied.

(Pls. Ex.4)

Specifically Plaintiff Kough's Step 1 grievance was returned to him unprocessed because no

informal resolution was attempted. However as previously cited above there is testimony by the

Inmate Grievance Coordinator, and it is written in SCDC policy, that that for grievances

involving criminal activity (as here)  informal resolution is not needed. (Defendants Exhibits

ECF 88-11 through 88-15). Further because of this response by SCDC Plaintiff Kough requested

but was refused a Step 2 grievance form to complete the process. Ms. Montouth testimony also

reflects this evidence related to Plaintiff Kough's grievances. She states:

    7 Q Can you explain I guess why at this point now
    8 there would have been no action taken on
    9 behalf of SCDC in regards to this Step 1
    10 grievance?
    11 MR. HARTE: Object to the form.
    12 THE WITNESS: I cannot, no.

(Pls. Ex.13F) Depo of Montouth 67:7-12).

    10 Q Now, at the bottom of them, it says,
    11 "Disposition by staff member," and I don't see
    12 any signatures or any dispositions on at least
    13 the ones that I've handed to you. Do you know
    14 why?
    15 A No, I don't.
    16 Q If they were sent to your facility, would they
    17 be documented anywhere?
    18 A Yes. I mean, if they were sent to me, you
    19 know, I would have done the disposition on it,
    20 signed and dated it. Maybe -- I don't know.
    21 I have no idea, you know, why they weren't
    22 sent.
    23 Q But that wouldn't be proper, right?

43

24 MR. HARTE: Object to the form.
25 BY MS. SULPIZIO:
1 Q You can answer.
2 A No.

(Pls. Ex.13F) (Depo of Montouth 69-70:1-25,1-2).

Despite Plaintiff Kough's attempts, it was through no fault of his own that he could not exhaust his administrative remedies, thus making the Inmate Grievance System unavailable to him as defined by the Court in <u>Ross</u> and <u>Booth</u>.

Accepting Plaintiff Kough's sworn testimony as true, as the Court must do on summary judgment, the SCDC administrative remedies were "unavailable" to Plaintiff Kough within the meaning of <u>Ross v. Blake</u> and <u>Rodriguez v. County of Los Angeles</u>, No. 13-56292, No. 14-55374 (9th Cir. May 30 2018) (Pls. Ex. 15-Rodriguez Case). Viewing the evidence and inferences therefrom in the light most favorable to the Plaintiff, there is at very least a question of fact as to whether Plaintiff Kough's delay in filing was due to the Defendants conduct and the grievance system not being available to him. Summary judgment accordingly must be denied as to Plaintiff Kough.

### b. As to Plaintiff Brian Littlejohn

According to Inmate Grievance Coordinator Anderson, Plaintiff Littlejohn failed to exhaust his administrative remedies. Mr. Anderson asserts:

8. Based upon my review of the available records, Plaintiff submitted a Step 1 Grievance, ECI-0329-17, on March 10, 2017, thirty-seven (37) days after the February 1, 2017 incident occurred. Plaintiff requested that Ofc. Cedric Major be reprimanded for not helping when he was assaulted.

9. Plaintiff's Step 1 grievance was returned to him because it was not timely filed in accordance with SCDC policy/Procedure GA-01.12, Inmate Grievance Policy system.

10. Based upon my review of the available records, Plaintiff submitted a second Step 1 grievance, ECI-0361-17, on march 24, 2017, explaining that his step 1 grievance was not timely because he was hospitalized from February 1, 2017-

February 10,2017. As a result, Plaintiff alleged he was not able to file a grievance during his hospitalization, and he was "still injured (sic) pretty bad when he got out of hospital so [he] wasn't able to write a grievance within the time frame… [he] wasn't in condition to be writing or anything…".

11. Plaintiffs Step 1 grievance was returned to him on march 20, 2017 because, in accordance with SCDC policy and procedure GA 01.12, Inmate Grievance Policy System, inmates cannot file a grievance regarding the disposition of previous grievance.

12. Based upon my review of the available records, at no time did Plaintiff file a Step 2 grievance regarding his complaints of failure to protect from inmate on inmate violence.

(Pls. Ex.16) Affidavit of Sheldon L Anderson, para. 8-12.

As previously noted, Plaintiff Littlejohn was not required to informally resolve his grievance about the criminal beating he suffered. Nor does the <u>Inmate Grievance System</u> require an inmate to request protective custody. Hence, these assertions do not entitle the Defendants to summary judgment.

With respect to Plaintiff Littlejohn's failure to timely file a Step 1 and Step 2 grievance, this failure is excused for purposes of summary judgment insofar as material questions of fact exist as to why Plaintiff Littlejohn failed to file these grievances. Specifically Plaintiff Littlejohn states:

11.     On or about February 1, 2017  I was assaulted by a gang members with an illegal contraband weapons when the officer on duty left and/or abandoned his post and/or failed to intervene in violation of SCDC polices.

12.     I filed a Step 1 Grievance on or about March 10, 2017 stating that Officer Major should be reprimanded for not helping me after I was stabbed on the wing. This grievance was returned to be as time expired.

13.     I filed another Step 1 Grievance explaining that the reason my grievance was late was because I was in the hospital for an extended period of time after receiving serious injuries from being stabbed. I requested to be able to refile my grievance. This was returned to me and stated that I could not file a grievance regarding the disposition of previous grievance.

14.     I believe the reason that my form was not processed properly was to allow officers to avoid scrutiny for their actions. Specifically because and SCDC officer was personally at fault and involved in my incident

(Pls. Ex.5). Affidavit of Brian Littlejohn, para. 11-14).

SCDC agrees that if an inmate is in the hospital he is afforded additional time to file his grievance. However that is not how the policy is being enforced by SCDC officials. Mr. Anderson's Affidavit conveniently leaves out the fact that Plaintiff Littlejohn's grievance was denied despite having a medical excuse and that he was refused a Step 2 form because his Step 1 was returned to him as unprocessed.

Despite Plaintiff Littlejohn's attempts, it was through no fault of his own that he could not exhaust his administrative remedies, thus making the Inmate Grievance System unavailable to him as defined by the Court in Ross and Booth.  Accepting Plaintiff Littlejohn's sworn testimony as true, as the Court must do on summary judgment, the SCDC administrative remedies were "unavailable" to Plaintiff Littlejohn within the meaning of Ross v. Blake and Rodriguez v. County of Los Angeles, No. 13-56292, No. 14-55374 (9th Cir. May 30 2018) (Pls. Ex. 5-Rodriguez Case). Viewing the evidence and inferences therefrom in the light most favorable to the Plaintiff, there is at very least a question of fact as to whether Plaintiff Littlejohn's delay in filing was due to the Defendants conduct. Summary judgment accordingly must be denied as to Plaintiff Littlejohn.

### c.  As to Plaintiff Craig Priester

According to Inmate Grievance Coordinator Anderson, Plaintiff Priester failed to exhaust his administrative remedies. Mr. Anderson asserts:

8. Based upon my review of the available records, Plaintiff submitted a Step 1 Grievance, RCI-0115-17, on March 10, 2017, he was placed in the wrong form with the ME inmates and [his] custody level is MI-2. Plaintiff went on to say that no correctional officers were inside of the Beaufort Housing Unit, A wing when he was "stab(sic) up". This Grievance was forwarded to the Office of Inspector General, Division of Police Services for review. When investigation met with Plaintiff on February 11, 2017, Plaintiff informed them he was not interested in pursuing the matter any farther and signed a criminal process withdrawal form, knowingly and voluntarily advising investigators he did not want to pursue the incident any further.

9.  Plaintiff step 1 grievance was returned to him for the following reasons; all pertinent information had been reviewed, and Plaintiffs grievance did not meet the criteria for "Criminal Activity" in accordance with SCDC Policy/Procedure GA-01-12 Inmate Grievance Policy System. Further, the response to Plaintiffs Step 1 Grievance noted that cell arrangements are not processed through the grievance officer and Plaintiff had not shown that SCDC staff performed their job duties inappropriately.

10. Plaintiffs step 1 grievance was not timely filed, as it was filed more than eight (8) days after the alleged assault. Plaintiff did not file a Step 1 grievance about the alleged incident until March 10, 2017, twenty-seven (27) days after the February 11, 2017 incident.

11. Based upon my review of the available records, on April 21, 2017 Plaintiff filed a step 2 grievance which repeated, verbatim the allegations raised in Plaintiffs Step 1 grievance. The responding official explain that Plaintiffs alleged placement in a housing unit for ME inmates when his custody status is MI is without merit. Pursuant to SCDC policy/procedure OP 21.04, Inmate Classification Plan, inmate are housed in such a manner as to ensure that the safety, security and treatment needs of all inmate are being met, taking into account an inmates criminal behavior profile, physical and mental health restrictions, prior history of assaultive behavior, Security Threat Group affiliation, and separation requirements, Plaintiffs step 2 grievance was therefore, denied.

12. Based upon my review of the available records, at no time prior to his alleged assault did Plaintiff make an attempt to informally resolve a grievance by submitting a Request to Staff Member (SCDC Form 19-11] or a RTSM through the kiosk to the proper staff member regarding his complaints of failure to protect from inmate on inmate violence.

13. Based upon my review of the available records, at no time prior to his alleged assault did Plaintiff request protective custody.

(Pls. Ex.17) Affidavit of Sheldon L Anderson, para. 8-13).

As previously noted, Plaintiff Preister was not required to informally resolve his grievance about the criminal assault he suffered. Nor does the Inmate Grievance System require an inmate to request protective custody. Hence, these assertions do not entitle the Defendants to summary judgment.

With respect to Plaintiff Preister's failure to file a Step 1 and Step 2 grievance, this failure is excused for purposes of summary judgment insofar as material questions of fact exist as to why Mr. Preister failed to file these grievances. Specifically Plaintiff Preister states:

11.     On or about February 11, 2017 I was assaulted by a gang members with illegal contraband weapons when the officer on duty left and/or abandoned his post and/or failed to intervene, despite prior notice, in violation of SCDC polices.
12.     I filed a Step 1 Grievance on or about March 10, 2017 stating that I was stabbed 23 times by another inmate. I specifically stated that no officer was inside of the wing when I got stabbed.
13.     My Step 1 Grievance was returned to me and stated that it did not meet the criteria for a criminal activity grievance and it was not timely filed. I do not understand that because I was assaulted and stabbed 23 times with a weapon.
14.     I filed a Step 2 Grievance on or about April 21, 2017 to appeal this decision and was served my final disposition on August 9, 2017.
15.     Since I filed my Step 1 and Step 2, I believe I have exhausted my administrative remedies.

(Pls. Ex. 6)(Affidavit of Craig Preister para. 11-15) (see also Defendants Exhibit ECF 87-15).

First, Plaintiff Priester's grievances were improperly denied. According to Ms. Montouth testimony his grievance meets the requirements for "criminal activity". Additionally the treatment of Plaintiff Priester's properly filed grievance activity shows yet gain how promised procedure operates as a "dead end". Plaintiff Priester experienced unavailability of the grievance process. Here the grievance procedure promised a referral to the Inmate Grievance Chief and the Division of Investigations, but in practice the Defendants refused to refer the criminal activity grievance to the proper parties for investigation and simply denied them. Once again, the Inmate Grievance System accordingly was clearly unavailable within this time period to Plaintiff Priester because of the Defendants' wrongful conduct. Viewing the evidence and inferences therefrom in the light most favorable to the Plaintiff, there is at very least a question of fact as to whether Plaintiff Priester's delay in filing was due to the Defendants conduct and the grievance system not being available to him as defined by the Courts in Ross and Booth.

### d.  As to Plaintiff Sterling Harley

As to Plaintiff Harley, he may not meet the standard for exhaustion of administrative remedies. If such a finding is to occur, only state claims would be left for Plaintiff Harley and

thus the Plaintiffs respectfully request Plaintiff Harleys' state claims be remanded to state court,

in the county of Jasper Civil Action No: 2017-CP-2700389.

### e.  As to Plaintiff Theryl Taylor

According to Inmate Grievance Coordinator Anderson, Plaintiff Taylor failed to exhaust

his administrative remedies. Mr. Anderson asserts:

> 8. December 23, 2016. In this grievance, Plaintiff lays out a factual recitation of
> the alleged assault. Plaintiff goes on to recount the medical treatment he received
> and his transfer from an outside medical facility to the Kirkland infirmary and
> then to a different correctional institution. Then, Plaintiff alleged that"[a]n
> enormous amount of corruption, drugs, K-2, etc. were continuously smuggled and
> distributed at Ridgeland along with other criminal conduct involving [Lt.
> Jenkins], inmate coordinators, and others that are currently being investigated by
> various law enforceful (sic), other governmental and private entities, and
> independently." Plaintiff requested the following action be taken: "Basic
> cooperation and investigation to identify and prosecute all involved persons.
> Compensation. Proper mental health treatment. Adequate security, future
> prevention of similar stack or worse. Hold [perpetrators] accountable.
> 9. Plaintiff's grievance was held in abeyance pending a review by SCDC's
> Division of Police Services.
> 10. On August 24, 2016, Plaintiff received a response to his grievance. This
> response summarized the natures of Plaintiffs allegations, thanks Plaintiff for his
> willingness to cooperate, and affirmed that any legal action taken in the alleged
> activities would be pursued by law enforcements authorities, and all persons
> involved would be held accountable.
> 11. Based upon my review of the available records, at no time did Plaintiff file a
> Step 2 Grievance regarding his complaints for failure to protect from inmate on
> inmate violence.
> 12. Based upon my review of the available records , at no time did Plaintiff file an
> appeal to the South Carolina Administrative Law court regarding his complaints
> of failure to protect from inmate on inmate violence.

 (Pls. Ex.18) Affidavit of Sheldon L Anderson, para. 8-12).

As previously noted, Plaintiff Taylor was not required to informally resolve his grievance

about the criminal beating he suffered. Nor does the <u>Inmate Grievance System</u> require an inmate

to request protective custody. Hence, these assertions do not entitle the Defendants to summary

judgment.

With respect to Plaintiff Taylor's failure to file a Step 1 and Step 2 grievance, this failure

is excused for purposes of summary judgment insofar as material questions of fact exist as to

whether Mr. Taylor failed to file these grievances. Specifically Plaintiff Taylor states:

> 11.     On or about December 6, 2016, I was assaulted by a gang members with
> illegal contraband weapons when the officer on duty left and/or abandoned his
> post and/or failed to intervene, despite prior notice, in violation of SCDC polices.
> 12.     I was hospitalized for 8 days after the attack and then in the infirmary for
> 5 days.
> 13.     I filed a Step 1 grievance as soon as I could after getting out of the hospital
> and the infirmary.
> 14.     I received a response from the Inmate Grievance Coordinator telling me
> that my grievance was being held in abeyance pending an investigation by
> SCDC's Police Services Division.
> 15.     I was then told that law enforcement authorities would be pursuing
> criminal prosecution against my attackers.
> 16.     Since my Step 1 grievance was essentially granted, I was not given a Step
> 2 grievance form by the Inmate Grievance Coordinator.  Step 2 grievance forms
> are not available except from the Inmate Grievance Coordinator when the Step 1
> grievance is denied.

 (Pls. Ex. 8).(Affidavit of Therl Taylor para.11-16)

> 12 So he was given five days from the 18th to
> 13 re-present, but he was not given the copies or
> 14 the forms until the 28th, so he could not meet
> 15 his five-day

(Plf. Ex. 13G)(See generally, Depo of Montouth  80-88)

> 15 Q I have here SCDC-Taylor 0830, 0835, 0837, and
> 16 0840. These are -- it says, "Request type,
> 17 grievance, requested by kiosk." These are for
> 18 Mr. Taylor, and all of the responses are -- it
> 19 says, "Author, MONTMAR." Would that be you?
> 20 A Uh-huh, right.
> 21 Q So the first one, 0830, could you read me what
> 22 Mr. Taylor requests?
> 23 A "Addendum to 16-0601369 specifically in

24 response to Ms. M. Montouth and company's
25 alleged reasons for failing to process this
1 grievance. First, it's illogically impossible
2 to attach the informal request to staff from
3 GTF or from the kiosk. To date, such has
4 never been done. Again, see Reference
5 No. 994586. Second, the handwritten markings
6 and scribbling on fourth line is unreadable.
7 Third, to the contrary, I specifically
8 followed GA0112 requirement. Knowing how
9 controversial and misleading, based on
10 history, adversary is in dealing with failing
11 to sincerely process grievances, I use caution
12 when compelled to initiate a Step 1 grievance
13 for processing through SCDC grievance staff.
14 Fourth, my informal went to the subject
15 matter - financial and/or supervisor. All I
16 have is a responder's number. You will have
17 to reveal the true identity, name of the
18 person or persons, you want to name on this
19 issue. Please identify."
20 And I wrote, "Inmate Taylor, you will
21 need to follow Grievance Policy GA112 outlined
22 dated May 12th, 2014, to resolve your issue."
23 Q And I think he wrote back again saying that he
24 did follow that policy, and he specifically
25 details in the next form, 0835, that he
1 received two more Step 1 grievances, filed
2 them within five days, and he's been trying to
3 get these grievances processed, but he's being
4 denied grievance forms, and they are
5 intentionally withheld for several months.
6 Security personnel do not have any, nor does
7 the IRC.
8 What is the IRC?
9 MR. HARTE: Hold on, hold on. I object
10 to the form of the lead-up to that
11 question.
12 BY MS. SULPIZIO:
13 Q Ms. Montouth, can you please read the kiosk on
14 Page 0835?
15 A "To Ms. Montouth, immediate supervisor, and
16 chief of grievance branch, Sherman Anderson.
17 The end of last week I received two more
18 Step 1 grievances or an RI014116 and RI14216
19 in a white envelope demanding I re-present

20 these two grievances within five days. First,
21 as I have stated previously and have been
22 ongoing timelessly requested on being
23 identified grievance forms, forms are
24 intentionally withheld from me for several
25 months. Security personnel do not have any,
1 nor does the IRC. I explained the five-day
2 requirement to the mailroom supervisor. She
3 did not help me obtain grievance forms."
4 Okay. I can remember sending Inmate
5 Taylor grievance forms, okay. Inmate
6 Taylor -- well, so that's not correct there.
7 Q Well, is there any documentation that you sent
8 him those grievance forms?
9 A No. What I've actually done is just put the
10 grievance forms with the grievances that I
11 sent him back. Okay. I do that on occasion.
12 Like if I'm going to send an inmate back a
13 grievance form, I will put another
14 grievance -- put a grievance in there for them
15 to respond on.
16 Q But there's no documentation showing that you
17 ever mailed him a grievance form?
18 A No. I mean, I wouldn't document that I sent
19 him the grievance form, but I do that.
16 this is just speculation -- that they knew
17 that he was just writing grievance after
18 grievance after grievance just to be writing
19 grievances. And I shouldn't even say that,
20 because I have no idea.

(Plf. Ex. 13H)(See generally, Depo of Montouth  80-88)

As shown above, accepting Plaintiff Taylor's sworn testimony as true as the Court must

do on summary judgment, the SCDC administrative remedies were "unavailable" to Mr. Taylor

within the meaning of <u>Ross v. Blake</u> and <u>Rodriguez v. County of Los Angeles</u>, No. 13-56292,

No. 14-55374 (9th Cir. May 30 2018). Viewing the evidence and inferences therefrom in the light

most favorable to the Plaintiff, there is at very least a question of fact as to whether Plaintiff

Taylor's delay in filing was due to the Defendants conduct and the grievance system not being

available to him. Summary judgment accordingly must be denied as to Plaintiff Taylor.

### f.  As to Plaintiff Roy Sutherland

As to Plaintiff Sutherland, the Plaintiffs agree he may not meet exhaustion of

administrative remedies. If such a finding is to occur, only state claims would be left for Plaintiff

Sutherland and thus the Plaintiffs respectfully request Plaintiff Sutherlands' state claims be

remanded to state court, in the county of Jasper Civil Action No: 2017-CP-2700389.

### g.  As to Plaintiff Joseph Wilson

According to Inmate Grievance Coordinator Anderson, Plaintiff Taylor failed to exhaust

his administrative remedies. Mr. Anderson asserts:

> 8.      Based upon my review of the available records, Plaintiff submitted a Step
> 1 Grievance, KCI-0215-16, on April 12, 2016, alleging an officer allowed
> unknown assailants  into his cell and left the wing. This Grievance was forwarded
> to the Office of Inspector General, Division of Police Services for review. When
> investigation met with Plaintiff on February 11, 2017, Plaintiff informed them he
> was not interested in pursuing the matter any farther and signed a criminal process
> withdrawal form, knowingly and voluntarily advising investigators he did not
> want to pursue the incident any further.
> 9.       Based upon my review of the available records, at no time did Plaintiff
> file a Step 2 grievance regarding his complaints of failure to protect form inmate
> on inmate violence.
> 10.     Based upon my review of the available records, at no time did Plaintiff file
> an appeal to the South Carolina Administrative Law Court regarding his
> complaints of failure to protect form inmate on inmate violence.
> 11.     Based upon my review of the available records, at no time prior to his
> alleged assault did Plaintiff make an attempt to informally resolve a grievance by
> submitting a Request to Staff Member (SCDC Form 19-11] or a RTSM through
> the kiosk to the proper staff member regarding his complaints of failure to protect
> from inmate on inmate violence.
> 12.     Based upon my review of the available records, at no time prior to his
> alleged assault did Plaintiff request protective custody.

(Pls. Ex.19) Affidavit of Sheldon L Anderson, para. 8-12).

As previously noted, Plaintiff Wilson was not required to informally resolve his

grievance about the criminal beating he suffered. Nor does the Inmate Grievance System require

an inmate to request protective custody. Hence, these assertions do not entitle the Defendants to summary judgment.

With respect to Plaintiff Wilson's failure to file a Step 1 and Step 2 grievance, this failure is excused for purposes of summary judgment insofar as material questions of fact exist as to whether Plaintiff Wilson failed to file these grievances. Specifically Plaintiff Wilson states:

> 11.    On or about April 12, 2016  I was assaulted by a gang members with an illegal contraband weapons when the officer on duty left and/or abandoned his post and/or failed to intervene in violation of SCDC polices.
> 12.    I filed a Step 1 Grievance on or about April 12, 2016 stating that  the SCDC officer let unknown assailants in my cell, left the wing, and then they stabbed me multiple times. I did not receive a response to this Grievance until January 18, 2017.
> 13.    I appealed and filed my Step 2 grievance on January 18, 2017. Mr. Anderson's affidavit states I did not file a Step 2, but I did.
> 14.    I was served with a final disposition on March 28, 2017.
> 15.    Since I filed my Step 1 and Step 2,  I believe I have exhausted my administrative remedies.
> 17.    I believe the reason that my grievances were not processed properly and were "lost" was to allow officers to avoid scrutiny for their actions. Specifically because and SCDC officer was personally at fault and involved in my incident.

(Pls. Ex. 7)(Affidavit of Joseph Wilson para. 11-15,17).

The treatment of Plaintiff Wilson's filed grievance activity shows yet gain how promised procedure operates as a "dead end".  In general, the Plaintiffs have experienced similar events by SCDC employees which made the grievance process" unavailable" to him. As previously mentioned:

> "….an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates….. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In Booth 's words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." … So too if administrative officials

> have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." … When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

135 S. Ct at 1859.

The <u>Inmate Grievance System</u> accordingly was clearly unavailable because no such potential existed for Plaintiff Wilson to exhaust . Plaintiff Wilson has experienced similar unavailability of the grievance process. Here the grievance procedure promised a referral to the Inmate Grievance Chief and the Division of Investigations, but in practice the Defendants refused to either refer the criminal activity grievance to the proper parties for investigation and simply denied them.

As to all Plaintiffs, once again, the <u>Inmate Grievance System</u> accordingly was clearly unavailable within this time period because of the Defendants' wrongful conduct. SCDC prevented the Plaintiffs from filing their grievances as shown above. As the Court in Booth stated, where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." … So too if administrative officials have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." … When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy. Here the Plaintiffs had no potential of relief, the Defendants automatically denied their attempts to fully exhaust.

To the extent the Defendant rely on the argument that the Plaintiffs should have appealed to the Administrative Law Court, this argument is also meritless. Specifically Ms. Montouth testified the last step and final disposition of the grievance procedure is a Step 2 and the administrative law court is just optional.

> 18 Q As part of the inmate grievance policy, I see
> 19 Section 13.9 Administrative Law Court. Tell
> 20 me about that. Where does that come into

21 play?
22 A Okay. That is the third step in the grievance
23 process. After the Step 2 has been completed
24 by the inmate grievance branch, and he does
25 not agree -- actually, our Step 2 is the
1 final, okay, response to a grievance process.
2 Q So your Step 2 is the final SCDC internal
3 decision?
4 A Yes.
5 Q So as part of your policy, that after Step 2
6 is ruled upon, SCDC's made their final
7 decision?
8 A Yes. Then he has the option of going to the
9 administrative law court.
10 Q And that is optional?
11 A It's up to him, you know. He's given the
12 paperwork to file if he wants to.
13 Q But that is not required for an SCDC final
14 decision, right? Your final decision for SCDC
15 is Step 2?
16 A Is the Step 2, yes.

(See Plf. Ex. 13I)( Depo of Mary Montouth 53-54: 18-25, 1-16).

Additionally the Administrative Law Court takes the grievance process out of SCDC's hands. In essence it is an external procedure that is not part of SCDC. The Administrative Law Court usually concludes that it cannot extend jurisdiction over an internal prison matter. See e.g. Lyles vs SCDC, Docket no. 16-ALJ-04-0685-AP (Oct. 13, 2016) (Stating "Consequently, the ALC cannot and should not extend its jurisdiction over an internal prison matter. See Al-Shabazz v. State, 338 S.C. 354, 382, 527 S.E. 2d 742, 757 (2000) (citing Pruitt v. State, 274 S.C. 565, 567-68, 266 S.E.2d 779, 780 (1980)) and Howard v. S.C. Dep't of Corr., 399 S.C. 618, 733 S.E.2d 211(2012)). Thus, yet again, leaving the Plaintiffs  at a dead end and making the grievance process unavailable

Therefore Summary judgment must be denied to the extent the Defendants claim the Plaintiffs failed to exhaust their administrative remedies.

IV.    **THE PROPERLY FILED GRIEVANCES BY OTHER INMATES AT RIDGELAND CORRECTIONAL INSTITUTION EXHAUSTED ADMINISTRATIVE REMEDIES FOR THE PLAINTIFFS AS A MATTER OF LAW.**

As the Fourth Circuit has explained on several occasion, the main purpose of the PLRA's exhaustion requirement is to allow "a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Moore v. Bennette, 517 F.3d 717, 726 (4th Cir. 2008). Consequently, "[i]n order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing….Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." Wilcox v. Brown, 877 F.3d 161, note 4 (4th Cir. 2017) quoting Turley v. Rednour, 729 F.3d 645 650 (7th Cir. 2013).

In 2015, 2016, and 2017 others inmates have filed grievances complaining that the wardens and the correctional officers at Ridgeland Correctional Institution have permitted inmates to have access to weapons, have failed to provide even minimum security to protect inmates from gang member inmates, and have been deliberately indifferent to the risk of harm inmates face from gang member inmates. These inmates further allege that they suffered beatings and stabbings as a consequence of these failures by the wardens and correctional officers. Thus all grievances that were filed prior to the assaults suffered by the seven Plaintiffs in this case, put SCDC on notice of the issues that have been occurring and has given them years to correct this ongoing and repetitive problem.

57

Specifically, the Plaintiffs are aware of several inmates at Ridgeland Correctional and also in other SCDC facilities that have been grieving about these same issues for years, but yet have continuously been denied access, punished, or retaliated against when using the grievance system. SCDC has been on notice of the violent assaults and policy violations for a long time and still has yet to remedy the situation. Inmates have tried to remedy the issues surrounding gang violence, but when they file grievances it has resulted in more attacks or leads them to a dead end.  The Reports and Affidavit of James Evan Aiken provide a good summary of how gang inmate violence has been on ongoing problem at SCDC for years. (See Exhibits 2,3 and 12). Again, the Court can also take judicial notice that SCDC has been sued *over 160 times*  since 2015 for allowing uncontrolled gang violence in SCDC.

> Inmates complained in lawsuits that South Carolina's prisons are home to "uncontrolled violence," where there are far too few guards, cells are left unlocked and gangs "run free and commit whatever crimes they want within the institution without fear of punishment," according to some of the 160-plus lawsuits filed against the state Department of Corrections since 2015.
>
> https://www.usatoday.com/story/news/2018/04/30/prison-riots-and-killings-rising-states-slash-budgets-guards/545299002/

In short, the uncontrolled gang violence at Ridgeland Correctional Institution *is an on-going problem that is well known and has been well known to the Defendants since 2015*. Rather than address and cure the problem, the Defendants are shamefully and knowingly using the PLRA exhaustion requirements to block injured inmates – most of who fear for their lives if they file a grievance because the grievances are not being kept confidential – from filing suit. This shameful use of the PLRA is obviously not what Congress intended when it made exhaustion mandatory for inmates.

Although the Fourth Circuit in <u>Wilcox </u>was addressing single prisoners, the rationale of its ruling -  "[i]n order to exhaust their remedies, prisoners need not file multiple, successive

grievances raising the same issue (such as prison conditions or policies) if the objectionable

condition is continuing." " Wilcox v. Brown, 877 F.3d 161, note 4 (4th Cir. 2017)

quoting Turley v. Rednour, 729 F.3d 645 650 (7th Cir. 2013) – is equally applicable when, as

here, one or more prisoners files a grievance complaining of uncontrolled inmate violence at Lee

Correctional Institute. That grievance should exhaust administrative remedies for other inmates

at Lee complaining about the exact same thing since it has put SCDC and Ridgeland

Correctional on proper notice.

  The Plaintiffs respectfully submit that the properly filed grievances by the exact same on-

going problem of uncontrolled gang violence at Ridgeland exhausted administrative remedies for

each of the instant Plaintiffs as a matter of law. The summary judgment motion should also be

denied for this reason.

  **V.**  **THE DEFENDANTS SHOULD BE ESTOPPED FROM RAISING THE**
       **ISSUE OF EXHAUSTION OF ADMINISTRATIVE REMEDIES DUE**
       **TO ITS ACTIONS WHICH ESSENTIALLY DENY THE PLAINTIFFS**
       **EFFECTIVE ACCESS TO THE GRIEVANCE SYSTEM.**

  Assuming arguendo, that the Court finds that the administrative remedies were available

and were not exhausted by the Plaintiffs, the actions of SCDC and its employees should act as a

bar from raising the defense of failure to exhaust administrative remedies. Since exhaustion

under prison Litigation Reform Act, 42 USCS § 1997e(a), is not jurisdictional, but rather an

affirmative defense that is subject to certain defenses such as estoppel, one appellate court

reversed a district court's decision dismissing inmate's 42 USCS§ 1983 claim pursuant to FRCP

12(c) and ordered district court to consider inmate's claim that correctional facility employees'

actions may have estopped state from asserting exhaustion defense. Ziemba v. Wezner, (2004,

CA2 Conn) 366 F3d 161.

In the current case, the Defendants' actions of ignoring the numerous requests to obtain grievance forms, ignoring already filed grievance, the multiple threats of violence on each Plaintiff, and the intentional failures to process the Plaintiff's grievances should estop the Defendants from asserting the defense of failure to exhaust administrative remedies. For the reasons set forth in this brief, it is believed that the Plaintiffs should be found to have exhausted his administrative remedies. Therefore Defendants' Motion should be denied.

## CONCLUSION

For the reasons stated, Defendants Motion for Summary Judgment must be denied as to each Plaintiff.


Respectfully submitted,


**BELL LEGAL GROUP, LLC**

s/ J. Edward Bell, III
 J. Edward Bell, III (FED ID# 1280)
Victoria S. H. Knight (FED ID #2257)
Gabrielle A. Sulpizio (FED ID #12715)
219 North Ridge Street
TEL.:(843)546-2408
FAX: (8430 546-9604
ebell@edbelllaw.com

**ATTORNEYS FOR PLAINTIFFS**


June 13, 2019
Georgetown, South Carolina