IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Richard Kough, | ) | |
| | ) | Civil Action No. 0:17-2938-JFA-MGB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| South Carolina Department of Corrections; | ) | |
| Warden Levern Cohen, individually | ) | |
| and/or in his official capacity as Warden of | ) | |
| Ridgeland Correctional Institution; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OUTLINE**

I.    Introduction

II.   Background

III.  Standard of Review

IV.   Discussion

      A.   Summary Judgment for Failure to Exhaust Administrative Remedies

           1.   Exhaustion of Administrative Remedy Process

           2.   Unavailability of Administrative Remedy

           3.   Analysis

      B.   Summary Judgment on the Merits of Kough's Claims

           1.   Evidence

                 a.   Investigative Reports and Incident Reports

                 b.   Lieutenant Oscar Torres' Affidavit

                 c.   Plaintiff's Deposition

d.     Defendant Cohen's Deposition and Affidavit

e.     Major Consonya Washington's and Lieutenant Edward Mole's Depositions

f.     Post Order Policies

g.     Roth Report

h.     Expert Reports

i.     Other Grieved Incidents at Ridgeland

2.     Eleventh Amendment Immunity

3.     Constitutional Claims against Defendant Cohen

a.     Violation of Kough's Fifth and Fourteenth Amendment Rights

b.     Violation of Kough's Seventh Amendment Rights

c.     Violation of Kough's Eighth Amendment Rights

1.     Legal Standards

i.     Failure to Protect

ii.     Supervisory Liability

2.     Analysis of Eighth Amendment Claims

4.     Kough's State Law Claims for Violation of SCTCA

5.     Injunctive Relief

V.     Conclusion

# I.     INTRODUCTION

Plaintiff Richard Kough ("Kough" or "Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 and the South Carolina Tort Claims Act ("SCTCA"), S.C. Code Ann. §§ 15-78-10 *et seq*. (Dkt. No. 25.) The case was originally filed as one multi-Plaintiff action on October 31, 2017, and later severed into separate actions.[1] (Dkt. No. 108.) Currently before the Court is Defendants South Carolina Department of Corrections ("SCDC") and Warden Levern Cohen's Motion for Summary Judgment. (Dkt. No. 88.) Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Rule 73.02(B)(2)(d), D.S.C., this matter has been assigned to the undersigned for all pretrial proceedings.

For the reasons set forth below, the undersigned recommends that Defendants' Motion for Summary Judgment be granted in part and denied in part. (Dkt. No. 88.) Specifically, the undersigned recommends that summary judgment should be denied as to Kough's claims on the issue of exhaustion. Summary judgment should also be denied as to Kough's § 1983 Eighth Amendment claims brought against Defendant Cohen in his individual capacity, Kough's § 1983 claim for prospective injunctive relief brought against Defendant Cohen in his official capacity, his state law claims for negligence and gross negligence against the SCDC, and his state law claim for injunctive relief against SCDC. The remainder of Plaintiff's claims should be dismissed with prejudice.

# II.     BACKGROUND

---

[1] This case is one of the many actions currently before the undersigned that have been filed by Plaintiff's counsel concerning inmate violence and understaffing at the South Carolina Department of Corrections. *See*, *e.g. Battle v. SCDC et al.*, 2:18-cv-719-TMC-MGB; *James Bethel, et al. v. SCDC, et al.*, 4:18-cv-1343; *Dexter Crawford v. SCDC, et al.*, 6:18-cv-2407); *Craig Ellerbe v. SCDC, et al.*, 6:19-cv-96; *Jamarcus Murray v. SCDC, et al.*, 6:19-cv-100. On August 13, 2019, the undersigned held a Global Status Conference, in which counsel in all the cases within this category appeared. (Dkt. No. 112.)

This civil action arises from an alleged riot that occurred at Ridgeland Correctional Institution ("Ridgeland"), wherein Plaintiff was beaten and stabbed. Plaintiff brings this action against Defendants SCDC and Warden Levern Cohen (collectively, "Defendants"). Kough alleges that he was attacked by another inmate as he was "leaving the showers" on July 9, 2016, at Ridgeland. (Dkt. No. 25 at 4.) On that date, "the dorm was supposed to be on lock-down," but "Correctional Officer Major . . . unlocked everyone's door and then abandoned his post by leaving the dorm unattended." (*Id.*) Kough alleges he was knocked out and dragged back into the shower area "where he was beaten and stabbed twice in the back and twice in the head." (*Id.*) Kough "woke up in his room to find the stab wounds, his eye swollen and his face all bloody. The inmates who attacked him and others then took over the dorm and Plaintiff Kough and others were held hostage for several hours." (*Id.*) After the "institution's red team" came to the dorm and "quell[ed] the disturbance," Kough was taken to the hospital where he stayed overnight. (*Id.*) Kough alleges that "an inmate had heard about the possible takeover prior to its happening and reported the same to one of the institution's nurses who in turn reported what she had been told. . . . Defendant SCDC and Defendant Warden Cohen took no action to prevent the takeover." (*Id.* at 5.)

According to Kough, "Ridgeland Correctional Institution. . . has a long history of violence among inmates housed in the institution and many times the violence is encouraged and/or condoned by the Defendants as the perpetrators are not punished . . . ." (*Id*. at 3.) He alleges that Defendants failed "to keep weapons out of the hands of inmates housed at Ridgeland Correctional Institution." (*Id*.) He further alleges that "Ridgeland Correctional Institution and other SCDC institutions are severely understaffed due to the failure to hire sufficient officers and due to a large number of turnovers." (*Id*.) Kough alleges that Ridgeland allows "inmates from one wing into another wing," thereby permitting "inmates who are suppose[d] to be kept apart to be together,

4

[which] facilitate[es] fights and stabbings." (*Id*.) According to Kough, these practices by Ridgeland violate SCDC's policies and procedures. (*Id*. at 4.)

Kough alleges that Defendants "acted in a negligent, grossly negligent, reckless, willful, wanton, and/or in a deliberate indifferent manner causing injury to the Plaintiffs" by, *inter alia*, "allowing uncontrolled violence in the correctional institution, . . . failing to provide protection and security for the Plaintiff, [and] . . . in failing to discipline its correctional officers for violations of SCDC policies and procedures." (*Id*. at 11–15.) According to Kough, such conduct violated his constitutional rights as well as his rights under the South Carolina Tort Claims Act.

The 17-page Amended Complaint alleges four causes of action for: (1) injunctive relief pursuant to S.C. Code Ann. § 15-43-30 and 42 U.S.C. § 1983; (2) deliberate indifference against Warden Cohen pursuant to § 1983; (3) failure to implement appropriate policies, customs, and practices against Warden Cohen pursuant to § 1983; and (4) violation of the South Carolina Tort Claims Act ("SCTCA") against SCDC and Warden Cohen. (*Id.* at 11–14.) In addition, the first paragraph of the Amended Complaint states that Kough seeks relief under "the Fifth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution." (*Id.* at 1.) Under the cause of action for deliberate indifference pursuant to § 1983, the Amended Complaint states, *inter alia*, that

> In committing the acts and omissions herein, Defendant Warden Cohen acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights under the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the Constitution of the State of South Carolina including but not limited to: 1) due process of law and 2) the right to be free from cruel and unusual punishment.

(*Id*. at 13.) Kough seeks injunctive and declaratory relief as well as actual, consequential, special damages, and punitive damages. (*Id.* at 11, 16.) Kough filed this action in the Fourteenth Judicial

Circuit Court of Common Pleas on September 25, 2017, and it was removed to this Court on October 31, 2017. (Dkt. No. 1.)

On April 12, 2019, Defendants filed a Motion for Summary Judgment, and the Motion was fully briefed. (Dkt. Nos. 88; 97; 102.) Subsequently, the Court granted the parties a limited re-opening of discovery to allow Defendant to supplement their responses to certain discovery requests from Plaintiff and to allow Plaintiff to depose Tom Roth, the author of a report on staffing levels at SCDC ("the Roth Report").[2]  (Dkt. No. 115.) Following the deposition on September 30, 2019, the parties submitted supplemental briefing on the dispositive motion. (Dkt. Nos. 124; 126.) The Motion has been fully briefed and is ripe for disposition.

## III.    STANDARD OF REVIEW

Defendants seek dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure both on the merits of the claims and on the basis that Kough has failed to exhaust his administrative remedies. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "To survive a motion for summary judgment asserting he failed to exhaust [his administrative remedies], an inmate is required to produce competent evidence to refute the contention that he failed to exhaust." *Noe v. S.C. Dep't of Corr.*, No. 818-cv-00256-DCC-JDA, 2019 WL 2090564, at *3 (D.S.C. Mar. 6, 2019), *adopted by*, 2019

---

[2] The Roth Report, discussed in detail below, was drafted by Tom Roth in connection with a settlement of another case against SCDC.

WL 2089275 (D.S.C. May 13, 2019) (citing *Hill v. Haynes*, 380 F. App'x 268, 270 (4th Cir. 2010) (holding that "to withstand a motion for summary judgment, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for trial")).

In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). Conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## IV.    DISCUSSION

### A.    Summary Judgment for Failure to Exhaust Administrative Remedies

#### 1.    Exhaustion of Administrative Remedy Process

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516 (2002).

Exhaustion is defined by each prison's grievance procedure, not the PLRA; a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v.*

*Bock*, 549 U.S. 199, 218 (2007). An inmate's failure to "properly take each step within the administrative process . . . bars, and does not just postpone, suit under § 1983." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002); *see also White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997) (upholding dismissal of an inmate's complaint because the inmate failed to proceed beyond the first step in the administrative grievance process).

The SCDC grievance procedure is outlined in SCDC Policy GA-01.12 ("Inmate Grievance System"). (Dkt. No. 97-1.) Subject to certain exceptions, the Inmate Grievance System requires that inmates initially attempt to resolve grievances informally by "submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days of the incident." (*Id.* ¶ 13.2.) Informal resolution is not required, however, when "the matter involves allegations of criminal activity." (*Id.*) With respect to criminal activity complaints, the inmate must file Form 10-5 Step 1 within five working days of the alleged incident. (*Id.*) The Inmate Grievance System provides:

> Any grievance which alleges criminal activity will be referred immediately to the Chief/designee, Inmate Grievance Branch. The IGC will note on the grievance tracking CRT screen that the grievance has been forwarded to the Inmate Grievance Branch for possible investigation by the Division of Investigations and the date on which the grievance was forwarded. The Chief/Designee, Inmate Grievance Branch, will consult with the Division of Investigations to determine if a criminal investigation would be appropriate. If deemed appropriate, the grievance will be forwarded to the Division of Investigations, to be handled in accordance with applicable SCDC policies/procedures. The grievance will be held in abeyance until the Division of Investigations completes their review/investigation.

(*Id.* ¶ 15.) If it is determined that a criminal investigation is not required, the grievance will be processed in accordance with the procedures applicable to non-criminal activity grievances. (*Id.*)

If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is required to respond in writing within 45 days and advise the inmate of his right to appeal to the next level:

> The Warden will respond to the grievant in writing (in the space provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for the decision rendered and any recommended remedies. The grievant will also be informed of his/her rights to appeal to the next level. The Warden will respond to the grievant no later than 45 days from the date the grievance was formally entered into the OMS system by the IGC. The response will be served by the IGC to the grievant, within ten (10) calendar days, and the grievant will sign and date the response acknowledging receipt. The IGC will maintain the original grievance for the inmate's grievance file and a copy will be given to the inmate.

(*Id.* ¶ 13.5)

The inmate may then appeal by filing a Form 10-5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of the receipt of the response. (*Id.* ¶ 13.7) The appeal is referred to the "responsible official" who is required to make a final decision within 90 days. (*Id.*) The Inmate Grievance System provides,

> As part of the Department's final answer to a grievance, the inmate will be notified that any further appeal must be initiated within 30 days after receipt of the Department's final answer. This appeal must be contained on the South Carolina Administrative Law Court "Notice of Appeal" that will be attached to the Department's final answer and must be sent to the Administrative Law Court. Instructions regarding completion of the form, and information indicating where the form must be sent, will also be provided to the inmate.

(*Id.* ¶ 13.9)

Alternatively, upon receipt of a Step 1 grievance, the IGC may determine that the Step 1 grievance will not be processed, which would render the grievance "non-grievable." (*Id.* 13.3) Specifically,

> [i]f the IGC determines that the grievance will not be processed, the IGC will note this on the SCDC Form 10-5, Step 1, under "Action Taken by the IGC," maintain the original for the inmate grievance file, enter "non-grievable" into the automated system, and mail a copy of the SCDC Form 10-5, Step 1, to the inmate in a sealed envelope.

(*Id.*) The appropriate way to appeal such an "unprocessed grievance" is not through submission of a Step 2 grievance. Rather,

[u]nprocessed grievances may only be appealed by utilizing SCDC Form 19-11, " Inmate Request To Staff Member," (RTSM) to the Branch Chief within ten (10) days of the grievance being returned to the inmate. The inmate must provide a copy of the unprocessed grievance with the RTSM. The inmate can not file a grievance against the IGC for un-processing the grievance. If the inmate has failed to provide necessary information, or has not signed and dated the grievance, s/he will be given five (5) calendar days to re-file a properly filled out grievance; this will be noted on the Step 1 form with a due back date included. This information will also be entered into the CRT narrative when the grievance is closed as unprocessed. Unprocessed grievances that have been given five (5) days to re-file cannot be appealed to the Branch Chief.

(*Id*.)

## 2.    Unavailability of Administrative Remedy

It is undisputed that Kough did not exhaust his administrative remedies in accordance with the Inmate Grievance System. Kough briefly argues that his administrative remedies should be deemed exhausted through "the properly filed grievances by other inmates at Ridgeland Correctional Institution." (Dkt. No. 97 at 57.) Specifically, Kough asserts that "[i]n 2015, 2016, and 2017 other inmates have filed grievances complaining that the wardens and the correctional officers at Ridgeland Correctional Institution have permitted inmates to have access to weapons, have failed to provide even minimum security to protect inmates from gang member inmates, and have been deliberately indifferent to the risk of harm inmates face from gang members." (*Id.*) However, Kough does not provide any examples of such grievances. Kough further asserts that the Court can "take judicial notice" of past lawsuits against SCDC "for allowing uncontrolled gang violence" in its prisons. (*Id*. at 58.)

As authority for this novel exhaustion argument, Kough cites the Fourth Circuit Court of Appeals case, *Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017). (*Id*. at 58.) In *Wilcox*, the court held that a prisoner who submitted an administrative grievance objecting to the cancellation of a religious service was not required to submit an additional grievance when the prison, after

resolution of the initial grievance, agreed to restart the services, then made a second decision to cancel the services. The court reasoned that the first grievance provided the prison with "notice of, and an opportunity to correct, a problem," which "satisfied the purpose of the exhaustion requirement." *Id*. at 167 n.4 (quoting *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013)). The court further stated, "to satisfy the exhaustion requirement, grievances generally need only be sufficient to alert the prison to the nature of the wrong for which redress is sought." *Id*. (internal quotations and citations omitted). Notably, *Wilcox* addressed only the grievances filed by a single inmate—the court did not consider whether grievances filed by one inmate could satisfy the exhaustion requirements for another inmate. There is no basis to find that *Wilcox* compels finding the exhaustion requirement satisfied on the rationale proffered by Kough in this case.

Thus, at issue here is whether the administrative remedies were unavailable to Kough, such that his failure to exhaust does not preclude his claims in this action. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).  In *Ross v. Blake*, the Supreme Court set forth three scenarios where the administrative process is considered "unavailable": (1) the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) the "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." 136 S.Ct. 1850, 1853–54 (2016).

The examples provided in *Ross* with respect to the first scenario indicate that a deficiency of this type would be systemic or widespread, or at least not isolated. *See Ross*, 136 S. Ct. at 1859 (giving the following examples of when an administrative remedy is a dead end: when a prison

handbook directs inmates to submit their grievances to a particular administrative office, but in practice that office disclaims authority to consider them; or when administrative officials have apparent authority but decline ever to exercise it). With respect to the third scenario, *Ross* seems to require that, to prevail on an assertion that prison officials thwarted his efforts to exhaust, an inmate must be able to demonstrate something more than isolated negligence on behalf of prison officials. *Id*. at 1860 n.3 (citing cases where correctional facilities staff misled the inmate about the existence of a process or its rules; used threats or intimidation; or misled him into thinking he had done everything necessary to use the process).

To prove unavailability, the inmate must "adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." *Graham v. Gentry*, 413 Fed. App'x 660, 663 (4th Cir. 2011). "The district court is 'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.'" *Zander v. Lappin*, 415 F. App'x 491, 492 (4th Cir. 2011) (quoting *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

### 3. Analysis

In support of their arguments that Kough has failed to exhaust his administrative remedies, Defendants submitted, *inter alia*, an affidavit from Sherman Anderson, the Chief of Inmate Grievance Branch for SCDC and the incident reports, grievances, and kiosk requests at issue. In response, Kough submitted, *inter alia*, his own affidavit as well as deposition testimony from Mary Montouth, the Inmate Grievance Coordinator at the time of the alleged incident. Having carefully reviewed the evidence submitted by the parties relevant to the exhaustion issue, the undersigned makes the following recommendations:

As noted, Kough alleges that he was beaten and stabbed by other inmates on July 9, 2016, and that this attack resulted from gang activity, inadequate security, and the proliferation of contraband at Ridgeland. (Dkt. No. 25 at 3–5.) The record shows that Kough filed a Step 1 grievance on July 21, 2016, stating, "On 7/23/16 [sic] there was no C.O. for Sav. B but we were let out of our cells anyway. I was attacked, beaten, and stabbed, along with other white inmates. Th[ere] was no C.O. to protect or help us." (Dkt. No. 88-5 at 1.) Under "Action Requested," Kough writes, "Hire more staff." (*Id*.) Under "Action Taken By IGC," the form lists three boxes: "processed," "unprocessed," and "other." None of the boxes are checked. Mary Montouth, the Inmate Grievance Coordinator, responded on September 14, 2016 that the grievance "is being held in abeyance pending" a review by SCDC's Division of Police Services. (*Id.*) Ms. Montouth responded to the grievance again on September 20, 2016, stating,

> Your grievance . . . was forwarded to Inmate Grievance Branch because of the content, but it has been processed and is being returned to you because you have failed to properly complete your grievance by seeking an Informal Resolution as outlined by the Grievance Policy changes. If you wish to continue with the processing of your grievance then you must seek an Informal Resolution and return your new grievance with the details of the informal Resolution from Major Washington and your Request-to-Staff attached, if you are not satisfied with the resolution. You have 8 days to refile your grievance after receiving a response.

(*Id*. at 2.)

After Plaintiff filed his Step 1 grievance on July 21, 2016, he filed several informal kiosk requests that referenced the stabbing at issue in August of 2016. These kiosk requests primarily focused on how Kough's housing would be affected by the investigation into the stabbing and Kough's pending transfer from Ridgeland. (Dkt. Nos. 88-11; 88-12; 88-13, 88-14.)

Here, Defendants argue that Kough failed to exhaust his administrative remedies because he failed to first make an informal attempt to resolve his complaint and he failed to file a Step 2 grievance or file an appeal to the Administrative Law Court. (Dkt. No. 3-1 at 30–31.) Defendants

have submitted an affidavit from Mr. Anderson, the Chief of Inmate Grievance Branch who avers

that his review of the available records indicates that Kough never filed a Step 2 grievance or filed

an appeal to the South Carolina Administrative Law Court "regarding his complaints of failure to

protect from inmate on inmate violence." (Dkt. No. 3-10 at 3.)

   In response, Kough cites his affidavit testimony in which he summarizes the treatment of

his Step 1 grievance. Specifically, Kough avers his Step 1 grievance was returned

> unprocessed because SCDC said I did not file an informal resolution (Request to
> Staff) which I understand is not necessary when the matter being grieved is a
> criminal matter. Since my Step 1 grievance was returned to me unprocessed, I was
> not given a Step 2 grievance form by the Inmate Grievance Coordinator. Step 2
> grievance forms are not available except from the Inmate Grievance Coordinator
> when the Step 1 grievance is denied.

(97-4 at 2–3.)

   As discussed above, it is undisputed Kough failed to exhaust his administrative remedies

following the incident at issue—Kough does not claim he filed a Step 2 grievance or otherwise

exhausted his administrative remedies. Thus, Kough's federal claims can only survive summary

judgment here if there is at least a genuine issue of material fact as to whether the grievance process

was unavailable to him. Here, the parties dispute whether Kough's Step 1 grievance was properly

processed, such that he could have filed a Step 2 grievance. The record shows that while Kough

was told his initial Step 1 grievance had "been processed," no decision was rendered by the Warden

granting or denying the grievance. The response provided on the grievance instructs Kough to

"seek an Informal Resolution" and to re-file the grievance if he is not satisfied with the response

to his attempt to informally resolve his complaint. In addition, "N/A" is written above the

Warden's signature line—only Ms. Montouth's signature is on the form. The Step 1 grievance

form includes the standard instructions that if an inmate is "not satisfied with the Warden's

decision, you may appeal" by filing a Step 2 grievance. However, it is unclear if the response to Kough's Step 1 grievance constituted an appealable decision by the Warden.

Upon review of the Inmate Grievance System, it is unclear how Kough could have exhausted his administrative remedies in this instance. Despite the response given on Kough's Step 1 grievance, it is not clear that an informal resolution attempt was required here. Ms. Montouth's deposition testimony conflicts with the response she wrote on Kough's Step 1 grievance. Specifically, she testified that an inmate alleging "criminal activity . . . . doesn't have to [file] an informal resolution on that." (Dkt. No. 97-26 at 2.) Ms. Montouth stated such "criminal activity" would include if an inmate "got beat up." (*Id.*) Kough's grievance states he "attacked, beaten, and stabbed along with other white inmates." Such conduct of inmate-on-inmate assault would certainly put the conduct at issue under the category of "criminal activity" as defined by Ms. Montouth and contemplated by the Inmate Grievance System.[3] Further, it is unclear how Kough should have appealed this Step 1 grievance, given the lack of clarity as to whether the response to Kough's Step 1 grievance constituted an appealable decision by the Warden. Accordingly, construing the evidence in the light most favorable to Kough, the undersigned finds an issue of material fact as to whether the Inmate Grievance System operated as a "dead end" in this instance, given the responses to Kough's Step 1 grievance, and the resulting confusion as to the next step necessary for exhaustion. *Ross*, 136 S.Ct. at 1853–54.

Further, Defendants' argument that an appeal to the Administrative Law Court is required to exhaust Kough's administrative remedies is without merit. Ms. Montouth's deposition testimony belies such a claim. Specifically, she testified that "our Step 2 is the final . . . response

---

[3] The Inmate Grievance System does not clarify this issue. It defines "criminal activity" as "any illegal activity to include sexual misconduct, staff assaults, transfer of drug/contraband, etc." (Dkt. No. 97-1 ¶ 19.) However, clearly an assault of any kind is "criminal activity" in the normal sense.

to a grievance process." (Dkt. No. 97-34 at 1–2.) She agreed that an appeal to the Administrative Law Court is "not required for an SCDC final decision," and she stated that the "final decision for SCDC is Step 2." (*Id.* at 2.) Moreover, "[c]ourts within the District of South Carolina have found that an inmate exhausts his administrative remedies when he completes Step 2 of the SCDC grievance procedure, and § 1997e(a) does not require inmates to further appeal to the ALC." *Gilchrist v. Pinson*, No. 5:11-cv-01746-MBS, 2013 WL 3946278, at *6 (D.S.C. July 31, 2013); *see, e.g.*, *Tudor v. Derrick*, No. 8:18-cv-953-RMG, 2019 WL 1473138, at *2 (D.S.C. Apr. 3, 2019) ("Plaintiff here exhausted his administrative remedies by filing a Step 1 and Step 2 grievance. . . . Plaintiff[] was not required to appeal to South Carolina's Administrative Law Court to exhaust his administrative remedies."); *Ayre v. Currie*, No. 0:05-cv-3410-HMH-BM, 2007 WL 3232177, at *7 (D.S.C. Oct. 31, 2007) ("The fact that the South Carolina Legislature made a court available to prisoners who wanted to appeal a final decision by a jail facility denying a grievance does not alter the federal PLRA by extending its administrative exhaustion requirement to include exhaustion in all state judicial forums. In § 1983 matters, Congress only intended that "administrative remedies" be satisfied."); *Charles v. Ozmint*, No. 2:05-cv-2187-DCN-RSC, 2006 WL 1341267, at *4 (D.S.C. May 15, 2006) ("[F]or purposes of the § 1997e(a) exhaustion requirement, that construction of the term "administrative remedies" to include appeals through the S.C. APA process is overbroad. The pursuit of the S.C. APA process would invoke state judicial remedies. . . . In § 1983 matters Congress only intended that "administrative remedies" be satisfied."); *but see Maradiaga v. Bethea*, No. 4:08–0226–PMD, 2009 WL 2829900, at *4 (D.S.C. Sept. 1, 2009) (finding that when "challenging a disciplinary conviction that results in a loss of sentence-related credits, an inmate must first appeal the denial of his Step 2 grievance to the South Carolina Administrative Court.").

Given these findings and the SCDC's alleged failure to provide Kough the opportunity to properly appeal the response to his Step 1 grievance, the undersigned finds an issue of material fact as to whether the Inmate Grievance System operated as a "dead end" in this instance such that the administrative remedy process was unavailable to him with respect to the July 9, 2016 assault.[4] *See Wilson v. Eagleton*, No. 1:18-cv-0050-RMG, 2018 WL 4908277, at *3 (D.S.C. Oct. 10, 2018) (finding administrative remedies were unavailable to the plaintiff where "the record supports finding that Defendants were 'consistently unwilling' to engage with Plaintiff's grievances, which Defendants were empowered to consider, but nonetheless 'declined [ ] to exercise' their authority to review"); *Mann v. Scott*, No. 0:14-cv-3474-RMG, 2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015) ("The Court finds that the prison's failure to respond to Plaintiff's RTS's made an administrative remedy unavailable in this case, excusing his resulting failure to exhaust prior to filing suit. The Motion for Summary Judgment is denied as to its administrative exhaustion grounds."); *Widener v. City of Bristol*, No. 1:13-cv-00053, 2014 WL 3058560, at *3–4 (W.D. Va. July 2, 2014) (denying defendants' summary judgment motion based on non-exhaustion in light of evidence "that the plaintiff attempted to fully exhaust the administrative remedies available to him before filing this suit" and the defendants' failure to meet their burden of proving that the plaintiff's efforts did not constitute exhaustion).

Accordingly, Defendants should be denied summary judgment based on non-exhaustion, and the Court should consider the merits of Kough's claims.

**B.     Summary Judgment on the Merits of Kough's Claims**

---

[4] Also, given the nature of the allegations in this case, the administrative grievance procedure is possibly futile. Here, Plaintiff seeks protection from future harm and compensation for past harm. It is unclear, and the parties have not addressed, how such a grievance could be remedied at the administrative level.

Defendants move for summary judgment on the entirety of Kough's claims. (Dkt. No. 88 at 1.) As described above, the Amended Complaint alleges four causes of action for: (1) injunctive relief against SCDC and Warden Cohen pursuant to S.C. Code Ann. § 15-43-30 and 42 U.S.C. § 1983; (2) deliberate indifference against Warden Cohen pursuant to § 1983; (3) failure to implement appropriate policies, customs, and practices against Warden Cohen pursuant to § 1983; and (4) violation of the South Carolina Tort Claims Act ("SCTCA") against SCDC and Warden Cohen. (*Id.* at 11–14.) In addition, the first paragraph of the Amended Complaint states that Kough seeks relief under "the Fifth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution." (*Id.* at 1.)

In his brief, Kough clarifies the conduct at issue in his claims. He alleges that "Defendants acted intentionally in permitting gang members to have access to weapons, in failing to appropriately ensure the safety and security of inmates, and subjecting [him] to violence." (Dkt. No. 97 at 5.) He further alleges that "Defendants were consciously indifferent to the likelihood that [his attack] would occur and thus violated [his] rights under the Constitution." (*Id.* at 6.) He also alleges that Defendants were grossly negligent in taking the above actions. (*Id.* at 7.) According to Kough, his claims for damages and injunctive relief under both § 1983 and state law are based on the above allegations. (Dkt. No. 97 at 6.)

For ease of reference, a summary of the evidence in the record is set forth below, followed by an analysis of Plaintiff's claims.

1.    **Evidence**

a.    **Investigative Reports and Incident Reports**

At the time of incident, Kough was housed in the Savannah Housing Unit at Ridgeland. (Dkt. No. 88-3 at 1–2.) According to the Investigative Report, on July 9, 2016, "two separate dorms

were rioting and several inmates were stabbed . . . and hospitalized for their injuries," including

Kough. (Dkt. No. 88-4 at 1.) As part of the investigation into the riot, Kough was interviewed on

February 16, 2017. During that interview, Kough reported that

> All he can remember was he was in his room asleep when suddenly he heard the
> commotion outside his room door. He got up to see what was going on. He was
> then confronted by several unknown black males armed with shanks. They began
> stabbing and beating him. He could not identify anyone because the room was dark.

(*Id.* at 60.)

Several incident reports were submitted by SCDC employees following the July 9, 2016

riot. An Incident Report dated July 9, 2016, and completed by Reporting Official Michael Lang,

details the events that transpired that day:

> Main Control Ofc. Anita Harris received an outside phone call stating that an
> inmate on Savannah B Wing was stabbed several times. Ofc. Harris contacted Cpl.
> Oscar Torres assigned to Savannah B Wing and had him conduct a security check
> of the units. Cpl. Torres discovered [another inmate] with several stab wounds and
> activated first responders. First responders responded to the unit and escorted [the
> inmate] to medical. Cpl. Torres received information that several other inmates
> were assaulted and conducted a search and discovered inmates Kough [and several
> others] . . . with stab wounds. All inmates were escorted to medical. Shift Lt.
> Michael Lang gave the order to close the yard and secure Savannah B Wing.
> Warden Levern Cohen and EAC Sgt. Reka Corley was [sic] notified. The inmates
> were seen by Nurse Carolyn Taylor. . . . . Lt. Lang directed Visitation Lt. Reginald
> White to close visitation and have all inmates return to their assigned units.
> Savannah B inmates were given several directives by the main control room and
> on-call official Darryl Patrick to return to their cells which they refused. Capt.
> Patrick directed all officers to exit the wing at which time several inmates began
> throwing objects from the top tier and busting out windows. Lt. Lang deployed two
> ISPRAs and two 37 MMs to the yard and established a perimeter around the unit.
> Lt. Edward Mole then notified main control that several inmates had gained access
> to the rec field. Lt. Mole was then authorized to utilize the 37 MM and deployed
> one round of Spede Heat CS to the rec field dispersing the inmates back inside the
> units. Lt. Lang directed Sgt. Kenneth Ayers to deploy the ISPRA inside the unit.
> Sgt. Ayers deployed approx. 4 burst from the ISPRA inside the unit. . . . Lt. Mole
> observed several inmates back on the rec field and Lt. Lang responded to the area
> and deployed two triple chasers on the rec field and all inmates returned back inside
> the unit. While Lt. Mole was recording the activity on the wing by the top back exit
> door, an unidentified inmate attempted to strike him through the busted window
> with a long metal pipe at which time he deployed the 37 MM rubber baton in the

inmates' direction. At approx. 10:45 AM Warden Levern Cohen arrived at the institution. On-call Maint. Mr. Leon Gant was contacted and reported to the institution. Warden Cohen instructed Lt. Lang to deploy more gas on the rec field to clear the inmates. Lt. Lang deployed two triple chasers on the rec field and the door was secured by Lt. Mole, Lt. Lang, and Cpl. Torres. Capt. Patrick notified main control that Beaufort A Wing was refusing to report to their cells. Beaufort A Wing was given several directives to report to their assigned cells. At approximately 12:26 PM all inmates on Beaufort A Wing [were] secured. At approximately 1:45 PM the Coastal Region RRT Team arrived at the institution. Lt. Lang was informed by medical that I.M. Kough also needed to be sent out for further medical treatment. . . . I/M Kough was transported to Coastal Carolina Hospital by Lt. Howard and Ofc. Mervin by SCDC van. At approximately 4:17 PM the RRT Team entered Savannah B Wing and secured the wing at approx. 4:28 PM. . . . Role [sic] call count was cleared at approximately 7:37 PM. All dorms remain on lockdown until further notice, and all inmates later returned to the institution from the hospital. All appropriate officials [were] notified.

(Dkt. No. 88-4 at 14–16.) In this Incident Report, Lang checked the boxes "unknown" for whether the incident was gang related or drug related. (*Id.* at 14.) Major Consonya Washington signed the Incident Report under "Major/Responsible Authority," and she wrote, "Incident is under investigation." (*Id.*)

### b.     Lieutenant Oscar Torres' Affidavit

Lieutenant Oscar Torres has submitted an affidavit, providing his account of what occurred in the Savannah Housing Unit on July 9, 2016. Torres avers that he was "the only correctional officer assigned to the Savannah Housing Unit at Ridgeland" that day. (Dkt. No. 88-3 at 1–2.) According to Torres,

That day, I opened all of the cell doors on the B Wing on the Savannah Housing Unit so that the inmates housed there could get up and get ready for the day. In order to open all of the cell doors on the B Wing of the Savannah Housing Unit, I unlocked the deadbolt on each cell door with a key. Then, I went through the sally port that separates the A Wing from the B Wing. While there, I received a request via my radio to contact Officer Anita Harris in the Ridgeland control room. Officer Harris informed me that she had received an outside telephone call regarding an inmate being stabbed in the Savannah Housing Unit, B Wing. I immediately returned to the B Wing and noticed a different atmosphere on the wing. The inmates were standing around and grouped together, watching what was going on. While checking out the wing, four (4) inmates approached me who had been stabbed. I

20

was informed by one (1) of the four (4) inmates that there was a fifth (5th) inmate who was stabbed. I found Plaintiff in his cell with several stab wounds. I gave Plaintiff the option to go to the infirmary with me, but Plaintiff refused because he did not think he would be safe. I then secured Plaintiff in his cell by locking the deadbolt so that only Plaintiff and his cellmate were in the cell. I gave all of the inmates a directive to clear the wing and return to their rooms, which I then locked for their safety. This process took about twenty (20) minutes as I walked around the entirety of the wing. While walking around securing inmates in their rooms, an inmate approached me and told me that I needed to step off the wing for my own safety. I then exited the wing and secured the wing door shut. Shortly thereafter, Capt. Patrick and I re-entered the unit to secure the remaining inmates. However, due to escalating violence by the inmates and their lack of cooperation, we were unable to secure all of the inmates in their cells. Capt. Patrick and I then exited the unit a second time and activated SCDC's Rapid Response Team.

(*Id*. at 2–3.)

### c.    Plaintiff's Deposition

During his deposition, Kough expanded on certain allegations in the Amended Complaint. Specifically, he explained why he believed a nurse had reported the possibility of the riot before it occurred. (Dkt. No. 25 at 5.) Kough testified that he was kept in a special medical dorm after he returned from the hospital. (Dkt. No. 88-6 at 7.) According to Kough, a nurse tending to him there told him that before the riot at issue occurred she treated an inmate who said he had been beat up by his friends after he refused to take part in their plan "to take over the dorm." (*Id.* at 7–8.) The nurse told Kough that she reported what the inmate said to contraband. (*Id*.) Kough could not remember the name of the nurse. (*Id*.)

### d.    Defendant Cohen's Deposition and Affidavit

Defendant Cohen also gave deposition testimony. He acknowledged that Ridgeland was sometimes understaffed. (Dkt. No. 97-9 at 1.) He testified it is "common" that there is only one correctional officer in a unit. (*Id*. at 2.) He explained that when a correctional officer wants to leave a wing or a unit, "the supervisor would have to be notified for replacement." (*Id*.) According to Cohen, the correctional officer "would have to be properly relieved" before leaving, even if there

was an emergency. (Dkt. No. 97-10 at 1–2.)  If there was no replacement, the correctional officer would "stay[] in place" or would secure the wing by locking all the cell doors. (*Id*.)

Cohen testified that as the warden of Ridgeland, he would meet with his "executive staff" weekly and they would give him "in-depth information as to what transpired that whole seven days," including "contraband issues" and "any disturbances . . . or major assaults." (Dkt. No. 97-11 at 1.) According to Cohen, Lieutenant Mole "compiles" the incident reports, the "MINs" and confiscation reports to "create his report," which he shares with Cohen and the executive staff. (Dkt. No. 97-12 at 1.) The report is kept on file and "a report is sent to division of security." (*Id*.)

Cohen testified that he has "had incidences" of guards or correctional officers bringing in contraband. (Dkt. No. 97-13 at 1.) When asked how contraband such as "folding knives" get into Ridgeland, Cohen testified that

> We have a prison industry where we have large tractor trailers coming in. Those vehicles are searched, but due to their size and hiding compartments on some of those larger vehicles, there are sometimes items that are missed. So either they come through our front lobby, or they came through our vehicle gate, or they came over the fence at this time.

(Dkt. No. 97-14 at 1.) Cohen also recalled that in January of 2017, a pistol was confiscated—a Glock 45 with 15 bullets. (*Id*.)

Cohen testified that he is "advised" in the determination of when random searches, target searches and cell searches needed to be done for contraband, and he is advised of "what the findings are" after the searches. (Dkt. No. 97-15 at 1.) He confirmed he is "advised of all findings of what contraband is confiscated." (*Id*.) He testified that the yearly report, the monthly report and the logbooks help him keep track of contraband at Ridgeland. (Dkt. No. 97-16 at 1.)

Cohen explained his role in the grievance process, stating he "review[s] the grievance once it comes from the grievance coordinator to have a response ready for that grievance." (Dkt. No.

97-16 at 1.) He speaks with the grievance coordinator as to "what facts she found" and then "that information is placed on the grievance." (Dkt. No. 97-17 at 1.) Cohen testified that he "can request an investigation," and that he would likely do so if there was a "serious injury" such as "physical assaults or stabbings." (Dkt. Nos. 97-17 at 1; 97-18 at 1.) He testified he mostly gets his lead for what constitutes a serious injury "from medical," explaining, "if [an] inmate has to be airlifted out, then I'm more than likely going to turn that over to Police Services. But if an inmate punched another inmate in the face, no." (Dkt. No. 97-18 at 1.) He also implied there would need to be "life threatening injuries" in order to initiate an investigation of an inmate on inmate attack. (Dkt. No. 97-19 at 1.)

In his affidavit, Cohen avers, *inter alia*, that Kough did not submit an informal request or grievance prior to the incident at issue "regarding a potential threat to his health or safety from any other inmate." (Dkt. No. 88-5 at 2.)

> **e.    Major Consonya Washington's and Lieutenant Edward Mole's Depositions**

Major Consonya Washington, the Major of Security (Dkt. No. 97 at 13), and Lieutenant Edward Mole, the Lieutenant of Contraband, also gave deposition testimony. In her deposition, Washington testified that it is a "serious" matter when an inmate "count does not clear," stating "That's a security concern for the staff, the inmates, and the public." (Dkt. No. 97-20 at 1.) She testified that she does "not personally" keep up with the assaults. (Dkt. No. 97-21 at 1.)

Washington testified that SCDC employees are "frisk-searched" when they come to work in order "to combat contraband being brought in." (Dkt. No. 97-22 at 1.) She did not know how employees were getting contraband in despite the frisking procedure. (*Id.*)

Washington also testified about the prison's policy on inmate movement within the prison: "After feeding, all inmates should report back to their assigned dorms. The unit wing doors should

be secured before moving to the next dorm. And the officers can assist by monitoring the inmates entering their wing while utilizing a dorm roster." (Dkt. No. 97-23 at 1.) During the deposition, counsel referenced a recommendation Washington had made "for wing officers needing to be more observant and monitor which inmates are entering which cells." (*Id*.) Washington read the response she received into the record, stating, "Shift supports should address the matter with the wing officers during briefings and impose employee corrective action for any officers not following the policy and/or post orders." (*Id*.)

In his deposition, Lieutenant Edward Mole testified that he "gather[s] the intel" on the gangs at Ridgeland and "advise[s] the warden of the situation." (Dkt. No. 97-24 at 1.)

### f.     Post Order Policies

Plaintiff has provided an SCDC document specific to Ridgeland titled "Security Post Description Number 35: Specific Institutional Housing Unit Officer," that is dated May 2, 2016. (Dkt. No. 97-41.) The document "specif[ies] the duties of the Housing Unit Officer in maintaining custody and control of the inmates assigned to the housing unit." (*Id.* at 1.) Most relevant here, the document states that a Housing Unit Officer's duties include: "Officer will remain on assigned wing at all times to maintain sight and sound of inmates"; "Housing unit officers may not leave this post until properly relieved"; and "During unit/institutional lockdown due to disturbance or for disciplinary reasons, all cells will remain locked and secured at all times". (*Id*. at 1–2.) A Housing Unit Officer's "specific duties" include, *inter alia*: "exchange inmate count information as well as any other vital information with on-coming officer"; "ensure that only inmates assigned to the wing are allowed entrance"; "ensure recreation doors are kept locked except when in use"; "ensure all dayrooms and closet doors remain locked when not in use"; "ensure security checks are conducted at least every 30 minutes and documented in the log book"; "ensure the recreation

yard security check (to include all fencing and locks) are conducted prior to and at the end of the recreation period and documented in the log book"; and "ensure all cell doors, all dayrooms, and all closets are secured before counts are conducted." (*Id.*) Both Washington's and Cohen's signatures are on the document. (*Id.*)

Plaintiff has also submitted an SCDC "Post Orders" document titled Housing Unit Number 35 and dated December 16, 2016.[5] (Dkt. No. 97-41 at 3.) The document states the "Post Orders" were approved by Michael McCall, Deputy Director for Operations. (*Id.*) The document "specif[ies] the duties of the Housing Unit Officer in supervising the inmates assigned within the duty post." (*Id.*) It states that "This officer will maintain inmate accountability, movement, and control within the duty post." (*Id.*) Most relevant here, the document states that a Housing Unit Officer's duties and responsibilities include, "ensure all wing doors are secured except while allowing entry or exit; "at no time will Unit keys be given to inmates"; "allow only assigned inmates entrance to Unit"; "ensure that inmates are counted independently by two (2) employees, during formal/roll call counts"; and "supervise day room activities." (*Id.* at 4–5.) The document also states that "During unit/institutional lock down, due to disturbance or for disciplinary reasons, all cells will remain locked and secured at all times. Cell doors will only be opened and secured, one at a time, for feeding, showers, medical issues, or as directed by the Major or above." (*Id.* at 5.) The document further states that "This officer will remain within sight and sound of the inmates to ensure constant supervision within the living area." (*Id.*)

### g.     Roth Report

The Roth Report has been provided to the Court for *in camera* review by Defendants.[6] As noted, this report was drafted by Tom Roth in connection with a settlement of another case against

---

[5] This Post Order is dated approximately five months after Kough was assaulted.
[6] Plaintiff has an unredacted copy of the Roth Report.

SCDC (the "Mental Health Settlement"), and it focuses on staffing levels at SCDC. The undersigned has addressed the relevance and discoverability of the Roth Report on numerous occasions in many of the cases that were included in the Global Status Conference.[7] In these rulings, the Court found the Roth Report relevant and discoverable. *See, e.g., Battle v. SCDC et al.*, 2:18-cv-719-TMC-MGB, Dkt. No. 67 at 2; Dkt. No. 79 at 3; Dkt. No. 114 at 3. The Court also found that the Roth Report is only "tangentially related to the Mental Health Settlement" and "is not covered by the confidentiality provisions of the Mental Health Settlement." *Id.*; Dkt. No. 79 at 3.

The Roth Report is dated March 2018 and analyzes 13 SCDC institutions, including Ridgeland. The report provides a "security staffing assessment" based on documentation reviews, staff interviews, and on-site assessments. (Roth Report at 9.) According to the report, the on-site facility visits began in September 2017. (*Id.*) It is unclear the relevant dates of the documents reviewed. Most relevant here, the report includes a detailed 18-page analysis of staffing issues specific to Ridgeland, including on how staffing at Ridgeland has impacted the number of contraband related incidents and incidents of assault. The report includes a chart of security staff levels at Ridgeland from 2011 to 2018, with an analysis of those levels. The chart shows "a 24% decrease in available staff from January 1, 2013 to January 1, 2018." (*Id.* at 215.) More specifically, the Report shows that in 2013, there were 144 assigned security staff at Ridgeland, 135 assigned security staff in 2014, 134 assigned security staff in 2015, 125 assigned security staff in 2016, 117 assigned security staff in 2017, and 109 assigned security staff in 2018. (*Id.* at 213.) The report states that "RCI has consistently been operating at extremely deficient levels when compared with both the *authorized strength* and approved *funding levels* for an extended period." (*Id.*) The report

---

[7] Defendants have not contested the discoverability of the Roth Report in this case.

defines *authorized strength* as "the current department recognized number of security positions required to operate the facility safety." (*Id.*) The report defines *funding levels* as "the number of personnel in each position classification approved by the department to be filled." (*Id.*)

The report summarizes how Ridgeland's staffing levels are deficient:

> In view of the available staffing levels, facility management personnel have had to deviate from the established staffing plan and implement several initiatives to maintain operations at the facility. . . . Under normal circumstances, security staff are responsible for one post at a time. Staff at RCI are routinely required to be responsible for meeting both their assigned responsibilities and responsibilities of an additional post. (*Id.* at 215.)

> . . .

> A major concern noted in the daily rosters was in the number of staff assigned to the inmate housing units. The general population housing units each have a maximum capacity of approximately (270). Inmates are housed on two separate wings. When the officer is on one wing it is impossible based on building design to observe the activity level on the other wing. In reviewing available documentation, conducting interviews with staff and personal observation, it appears there is normally between one and two front-line staff assigned to each general population unit. . . . Having one or two officers on the day shift assigned to a housing unit as is the case at Ridgeland jeopardizes the opportunity to meet established post responsibilities and the ability to maintain a safe and secure environment. (*Id.* at 225.)

> . . .

> Ridgeland is a campus-style institution with four general population housing units, programs and service areas surrounding a large open courtyard. To get from the housing unit to most program activities and services inmates are required to walk through the open courtyard. It is essential, and a fundamentally sound practice that security staff be present to monitor and control the inmate movement throughout the facility. On the day of the site visit, the shift commander was the only security staff member available to observe and control inmate movement preventing that staff member from focusing primarily on running the entire shift. Dedicated yard officers should be consistently assigned to the courtyard to assist in monitoring existing inmate movement, prove roving physical plant security and serve as responders throughout the facility. (*Id.*)

The report explores the impact that such deficient staffing has on the prison operations, including the increase of contraband related incidents and incidents of assaults. Specific to contraband, the report states that

> The introduction and presence of contraband in a correctional facility is and has always been a primary management concern. Contraband often leads to unauthorized movement, destruction of property, compromised staff, public trespassing, criminal activity, and violence. At Ridgeland, significant contraband related incidents involving weapons and/or cell phones were more prevalent than in any other facility reviewed. (*Id*. at 218.)

The report specifically analyzes the levels of contraband related incidents at Ridgeland from 2015 through 2017, and provides a chart identifying "the frequency in which weapons and/or cell phone incidents were reported at Ridgeland in comparison with the other male facilities reviewed in this project." (*Id*.) The chart shows that in 2015, there were 78 weapon incidents at Ridgeland, compared with the overall average of 69 weapon incidents. In 2016, there were 123 weapon incidents at Ridgeland, compared with the overall average of 73 weapon incidents. In 2017, there were 98 weapon incidents at Ridgeland, compared with the overall average of 56 weapon incidents.

> The report summarized the chart findings, stating
>
> As shown, over twice the number of cell phone incidents were reported in 2016 and 2017 and the number of weapon related incidents at the facilities were higher than comparable average in each of the past three years. . . . The chart clearly shows that the introduction and presence of contraband at Ridgeland has consistently been a management issue for the past three years. . . . [T]here is no indication that the reason for the higher level of contraband related incidents at Ridgeland is due to housing unit staff conducting more searches. (*Id*.)
>
> The report remarks on these high numbers, noting
>
> At Ridgeland there appears to be a consistent demand and opportunity to be in possession of contraband. What is unusual at Ridgeland, is the consistent volume of incidents related to contraband compared to other facilities reviewed. For many inmates at Ridgeland, possessing or the attempt to possess contraband appears to outweigh the risk and perceived probability of being apprehended. (*Id.* at 218–19.)

The report recommends ways that management should remedy these issues with contraband and staffing:

> One of the keys to an effective prevention and detection plan is to establish a realistic plan based on existing resources to prevent, identify and detect contraband as a facility-wide goal. Part of the plan should ensure fundamental practices including searches, patrol, detection, and intelligence gathering are consistently incorporated into daily workload activities by all staff, not just those assigned to contraband control. To carry out the plan, supervisory staff need to be vested and properly trained and staff to be responsible for no more than one post assignment at a time to meet their responsibilities. Once an employee becomes responsible for more than one post, the breakdown begins. (*Id*. at 219.)
> . . .
>
> Contraband . . . is a major concern at Ridgeland. Patrolling both the courtyard and perimeter is critical to identify and deter unauthorized movement in these areas."
> (*Id*. at 223.)

As noted, the report includes a detailed analysis on the impact of deficient staffing on the incidents of assault:

> A second risk factor that is often associated with staffing levels is the number of assaults that occur at a facility. The number of staff, staff training, and experience level of staff is often referenced as one of the causes of prison violence. . . . It has been my experience, most inmates when contemplating committing an assault look for opportunities to carry out the act without being detected. Having two staff assigned to a 270-bed housing unit which contains limited to no electronic surveillance support or having one staff member on the courtyard during movement periods creates an environment where the perceived opportunity to commit an assault, if interested, can initially go undetected. This appears to be the case at Ridgeland. There is simply not enough staff to consistently cover all the required areas and send the message when involved in criminal activity, the risk of being apprehended for the same will be great. (*Id.* at 219.)

The report includes a chart on the number of reported assaults at Ridgeland from 2015 through 2017, separating inmate-on-employee assaults from inmate-on-inmate assaults. (*Id.* at 220.) The chart shows that at Ridgeland in 2015 there were 26 instances of inmate-on-inmate assault, in 2016 there were 56 instances of inmate-on-inmate assault, and in 2017 there were 41 instances of inmate-on-inmate assault. The average number of inmate-on-inmate assaults at Level

2 SCDC institutions from 2015-2017 was 27. The report states that "At Ridgeland, the total number of reported assaults in 2017 was consistent with the total overall average number of assaults reported by the other male level 2 facilities reviewed. Inmate-on-inmate assaults at Ridgeland were higher while inmate-on-employee assaults was lower than average. Any assault is one too many . . . ." (*Id*. at 220.)

### h.    Expert Reports

Kough has submitted three expert reports drafted by his expert James Aiken, a former Warden, Deputy Warden, and Deputy Regional Administrator in South Carolina.[8] In his expert reports, Mr. Aiken opines, *inter alia*, that: (1) Defendants consistently failed to follow their existing policies and procedures and failed to employ reasonably sound correctional practices regarding basic safety, security and protection for the Plaintiffs; (2) Defendants were on notice and knew about these failures and the danger these failures would pose to the Plaintiffs; and (3) Defendants should have taken certain actions to reasonably prevent, detect, respond and contain the security failures that caused the incidents at issue.

Mr. Aiken bases his opinions in part on the documentation of contraband confiscated at Ridgeland from March 2016 to January 2017. (Dkt. No. 97-3 at 5–6.) Relevant here, Mr. Aiken notes that in March 2016, "52 knives, homemade knife shanks/weapons were confiscated" at Ridgeland, and in June 2016, "59 knives, homemade knife shanks/weapons were confiscated." (*Id*.) He also notes that in 2014, "278 knives, homemade knife/shanks were confiscated" at Ridgeland; in 2015, "407 knives, homemade knife/shanks were confiscated"; and in 2016, a total

---

[8] Mr. Aiken's initial expert report and supplemental expert report pertain to all the plaintiffs that were originally included in the multi-plaintiff action filed October 31, 2017. His second supplemental expert report pertains to all the cases that were included in the Global Status Conference.  The undersigned has discussed these expert reports in detail in a prior Order (Dkt. No. 137) and has found Mr. Aiken's expert testimony admissible at the summary judgment stage.

of "414 knives, homemade knife/shanks were confiscated." (*Id*. at 6.) Mr. Aiken opines that these levels of contraband "placed Defendants on specific and validated notice to a reasonable degree of certainty that Plaintiffs were placed in life endangerment peril while each person was under the Defendants' custody and control." (*Id.*) According to Mr. Aiken, these contraband levels are "a clear validation that the contraband control as well as inmate supervision and gang management systems are in failure mode." (*Id.* at 8.) He opines that "Staff is not providing the necessary security supervision to prevent, detect, respond, and contain the situations prior to deterioration into life-threatening critical events involving violence." (*Id*.)

Mr. Aiken opines that once contraband confiscation was at these levels, Defendants should have "cease[d] all normal prison operations except for modified food service delivery, medical care" and "intensif[ied] . . . security services." (*Id*.) According to Mr. Aiken, "during the suspension of normal prison operations, a complete empirical assessment" should have been made, which would include an objective assessment of "staff sight and sound supervision of inmate population," "in-depth interviews with all members of the prison staff individually and collectively to intensely listen to their concerns relative to the safety and well-being of everyone assigned to that facility inclusive of the inmate population," and "interviews with each inmate assigned to the facility individually in order to ascertain their perceptions or factual information regarding the safety and lives of all concerned." (*Id*. at 8–9.) Mr. Aiken opines that "Defendants failed to provide basic security, safety to an elementary level of prisoner supervision. It is therefore to a reasonable degree of certainty, that these critical events would have been avoided if these basic measures were in place and operationalized (basic sight and sound supervision, gang management and contraband control)." (*Id*. at 17.)

In the second supplemental expert report,[9] Mr. Aiken discusses the findings in the Roth Report. He opines, *inter alia*, that

> The Roth Report further validates that there are blatant and obvious causal and easily predictable interconnections of perilous life endangerment attacks to Plaintiffs and staffing critical failures. . . . The Defendant and Wardens did not take basic security and safety staffing measures that would have reasonably prevented these violent critical attacks. . . .
>
> Defendant and Wardens were placed on specific notice of the life endangerment staffing peril and did not take effective actions (providing basic inmate supervision, contraband control and gang management) to correct the critical life endangerment peril.

(Second Supplemental Expert Report at 12, 14.)

### i.    Other Grieved Incidents at Ridgeland

As noted, prior to severance, this case was originally a multi-plaintiff action. Accordingly, the record includes documents related to the assaults allegedly suffered by the other plaintiffs during a twelve-month period at Ridgeland from April 12, 2016 to February 11, 2017. These documents show the following:

On April 12, 2016, Officer Devin C. Williams filed an Incident Report stating he heard a "loud disturbance" on the Beaufort A Wing and found inmate Joseph Wilson "with a cut to the facial area." He "then noticed that [inmate] Wilson was bleeding from his back too." Wilson "was taken to medical and the form was placed on lock-down. During this time the dorm refused to go to their rooms." (Dkt. No. 86-4 at 1.) Under "Supervisor's Comments," it states, "Forward to contraband for investigation." (*Id.*) The Incident Report checks the box indicating the incident was gang related. (*Id.*) A "MIN"[10] entry submitted by M. Lang states that an inmate-on-inmate assault occurred on April 12, 2016 with a "sharpened weapon" resulting in "major" injury. (*Id.* at 8.)

---

[9] This report was originally provided to the Court for *in camera* review by Plaintiff.
[10] "MIN" is an acronym for Management Information Notes.

Wilson filed a Step 1 grievance on April 12, 2016 that "claims officer let unknown assailants in his cell and left the wing. The unknown assailants stabbed him multiple times. Forwarded to OIGPS for review." (Dkt. No. 86-12.)

On November 2, 2016, Unit Manager Torelle Housey filed an Incident Report stating that he "was escorting Georgetown B Wing to the cafeteria for lunch" when he observed inmate Sterling Harley and two other inmates "in an altercation on the yard on the grass between the canteen and the blue postal mailbox." (Dkt. No. 82-5 at 1.) Housey writes, *inter alia*, "I gave several directives to stop. The inmates continued swinging and punching each other. Then I observed I/M Weeks dropping a homemade shank to the ground and running towards the commissary. I/M Samuel began stabbing I/M Harley multiple times while falling to the ground." (*Id.*) On November 14, 2016, Harley filed a Step 1 grievance stating that he was stabbed "multiple times on the yard" on November 2, 2016, and was transferred to the hospital as a result. (Dkt. No. 82 at 15.)

On December 23, 2016, inmate Therl Taylor submitted a Step 1 grievance in which he states he "was lured and brutally attacked by 7-10 i/ms in CB#5, knocking me unconscious. . . . A video interview and pictures were conducted . . . . Police services are ongoing." (Dkt. No. 83-13 at 1.) Under "Action Requested," Taylor writes, "Basic cooperation & investigation to identify and prosecute all involved persons. Compensation. Proper mental health treatment. Adequate security, future prevention of similar attack or worse. Hold perps accountable." (*Id.*) Defendant Cohen responded to this grievance on August 24, 2017. Cohen summarized the nature of Taylor's allegations, thanked Taylor for his willingness to cooperate in any related investigations, and affirmed that "[a]ny legal action taken in the alleged activities [would] be pursued by law enforcement authorities, and all persons involved [would] be held accountable." (*Id.*) Warden

33

Cohen stated he considered Taylor's grievance "as having been addressed and resolved" and told Taylor he could file the requisite Step 2 appeal form if he disagreed with this decision. (*Id*.)

A "MIN" entry dated February 1, 2017 and "updated" by Consonya Washington states an inmate-on-inmate assault with a sharpened weapon occurred, resulting in major injury. (Dkt. No. 84-4 at 1.) The "MIN Narrative" states that inmate Brian Littlejohn "was transported by helicopter" after the assault. (*Id*. at 2.) It states that "all appropriate staff" was notified. (*Id*. at 3.) On March 10, 2017, Littlejohn filed a Step 1 grievance. Although difficult to read, the grievance recounts the attack at issue and attributes it to Officer Major "running both wings" when there was "suppose[d] to be an officer assigned to each wing." (Dkt. No. 84-11.) Under "Action Requested," Littlejohn asks that Officer Major be reprimanded for not helping him when he was assaulted. (*Id*.)

A "MIN" entry dated February 11, 2017 states that an inmate-on-inmate assault with a sharpened weapon occurred, resulting in major injury. (Dkt. No. 87-6 at 1.) The "MIN Narrative" states that an officer "assigned to the Beaufort A Wing heard a noise that sounded like an altercation" and observed an inmate "running out" the wing door "holding a large homemade shank" and running after another inmate. (Dkt. No. 87-6 at 2.) After the officer discovered an inmate "on the ground covered with blood," he called first responders. Another officer "opened the Beaufort A Wing door" and observed inmate Craig Priester "covered in blood." Priester was transported to MUSC by helicopter. (*Id*. at 3.) Priester filed a Step 1 Grievance on March 10, 2017, writing he was stabbed "23 times at Ridgeland on February 11, 2017." (Dkt. No. 87-14 at 1.) He filed a Step 2 Grievance on April 21, 2017, again recounting his attack. (Dkt. No. 87-16.)

## 2.     Eleventh Amendment Immunity

Defendants assert that certain § 1983 claims against Defendants are barred by the Eleventh Amendment. (Dkt. No. 88-1 at 20–21.) Relevant here, the Amended Complaint alleges a § 1983

claim for injunctive relief against SCDC and alleges § 1983 claims against Cohen for monetary damages and injunctive relief in both his official and individual capacities.

The Eleventh Amendment prohibits federal courts from entertaining an action against a state. *See*, *e.g.*, *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (citations omitted); *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890). Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Accordingly, "[s]tate officials may only be sued in their individual capacities." *Rhoden v. S.C. Dep't of Corr.*, No. 4:17-cv-2537-HMH-TER, 2017 WL 9288217, at *3 (D.S.C. Oct. 4, 2017) (finding claims against prison warden in his official capacity should be dismissed because warden is entitled to Eleventh Amendment immunity), *adopted by*, 2017 WL 5494126 (D.S.C. Nov. 16, 2017), *amended*, 2017 WL 6032341 (D.S.C. Dec. 6, 2017); *Edwards v. Patell*, No. 4:06-cv-0748-HFF-TER, 2007 WL 2428548, at *8 (D.S.C. Aug. 21, 2007) (dismissing claims brought against defendant "employee of SCDC" in his official capacity). "As a state agency, SCDC is an arm of the State of South Carolina." *Abebe v. S.C. Dep't of Corr.*, No. 0:09-cv-3111-MBS-PJ, 2010 WL 2991595, at *2 (D.S.C. July 2, 2010), *adopted in part*, 2010 WL 3258595 (D.S.C. Aug. 16, 2010).

The Supreme Court has found that a suit for injunctive relief against a state officer to prevent ongoing violations of federal law is not a suit against the state for purposes of the Eleventh Amendment. More specifically, in the landmark Supreme Court decision, *Ex parte Young*, the

35

Court held that, although prohibited from giving orders directly to a State, federal courts could enjoin state officials in their official capacities. 209 U.S. 123, 155–56 (1908). "The *Ex Parte Young* exception is directed at 'officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings'" to enforce an unconstitutional act against affected parties. *McBurney v. Cuccinelli*, II, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex Parte Young*, 209 U.S. at 155-56). "Thus, to correctly plead such a claim, the proper State official must be included as a defendant by name and identified in the body of the complaint with a specific unconstitutional policy, custom, or practice." *Smith v. City of Huntington*, No. 3:17-cv-03806, 2017 WL 5180456, at *3 (S.D.W. Va. Sept. 28, 2017), *adopted sub nom. Smith v. City of Huntington*, 2017 WL 5180437 (S.D.W. Va. Nov. 8, 2017); *see also Woods v. S.C. Dep't of Health & Human Servs.*, No. 3:18-cv-00834-MGL-KDW, 2019 WL 1995136, at *6 (D.S.C. Apr. 18, 2019) (finding that a "claim for prospective injunctive relief permitted by *Ex Parte Young* . . . would be brought against state officers or agency employees in their official capacities"), *adopted by*, 2019 WL 1995511 (D.S.C. May 6, 2019).

Notably, by voluntarily removing a case to federal court, a defendant waives any immunity from suit in federal court with respect to any claims it otherwise would have been subject to in state court.[11] *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 619 (2002) ("A State's voluntary appearance in federal court waives sovereign immunity for claims where a state has consented to suit in its own courts for such claims); *see also Cameron v. Cox*, No. 10–1278, 2011 WL 1235308, at * 4 (D.S.C. Jan.21, 2011), *adopted by*, 2011 WL 1212177

---

[11] Such voluntary removal does not waive a defendant's immunity to any § 1983 claims, however. *See Passaro v. Virginia*, 893 F.3d 243, 248 (4th Cir. 2019) (rejecting argument that the Commonwealth waived its sovereign immunity to a Title I claim by removing case to federal court); *Stewart v. North Carolina*, 393 F.3d 484 (4th Cir. 2005) (holding that where a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court).

(D.S.C. Mar. 30, 2011). Through enactment of the SCTCA, South Carolina has generally consented to suit for tort claims filed against it in state court. *Briggs v. South Carolina Dept. of Corrections*, No. 13-cv-1348, 2014 WL 1278173 at *21 (Mar. 27, 2014).

Based on the foregoing, the undersigned recommends that the Eleventh Amendment bars Plaintiff's § 1983 claim for injunctive relief against SCDC and bars Plaintiff's § 1983 claims for monetary damages brought against Defendant Cohen in his official capacity. However, under *Ex Parte Young*, the Eleventh Amendment does not bar Plaintiff's § 1983 claim for prospective injunctive relief to the extent it is brought against Defendant Cohen in his official capacity. Finally, because SCDC and Defendant Cohen voluntarily removed this case to federal court and South Carolina has consented to suit for tort claims filed against it in state court, Defendants are subject to suit in this Court for the state law claims asserted against them.

### 3.    Constitutional Claims against Defendant Cohen

Kough brings several claims against Defendant Warden Cohen for constitutional violations pursuant to § 1983. He alleges that Warden Cohen deprived Plaintiff of his rights, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, to due process of law and to be free from cruel and unusual punishment. (Dkt. No. 25 at 11–13.) More specifically, under this cause of action, he alleges that Warden Cohen acted in a "grossly negligent and . . . in a deliberate indifferent manner" by, *inter alia*, "allowing uncontrolled violence in the correctional institution"; "failing to provide protection and security for the Plaintiff"; and allowing inmates to have dangerous weapons." (*Id.*) Kough also alleges Warden Cohen failed to adequately train and supervise SCDC employees. (*Id.* at 13–14.) Kough alleges that this failure amounts to deliberate indifference to his right to be free from threats to his life under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id.*) Kough also alleges that Warden Cohen

deprived him of his constitutional rights by "implicitly or explicitly, adopt[ing] and implement[ing] careless and reckless policies, customs, and practices, including . . . failing to prevent inmates from obtaining and possessing dangerous weapons." (*Id*.) Finally, as noted above, the Amended Complaint also vaguely asserts that relief is sought under to the Seventh Amendment of the United States Constitution. (*Id*. at 1.)

> a.    **Violation of Kough's Fifth and Fourteenth Amendment Rights**

In his brief, Kough states that "Defendants failed to protect the Plaintiffs from violence in violation of the Plaintiff's Fifth, Eighth, and Fourteenth Amendments." (Dkt. No. 97 at 21.) According to Kough, his claims "for violations cruel and unusual punishment are based on Defendant Warden Cohen's deliberate indifferent actions in failing to ensure health and safety of the Plaintiffs, in subjecting the Plaintiffs to bodily harm, and allowing them to be in an uncontrolled violent environment despite having knowledge that it would subject them to harm." (*Id*.) Kough states this his "Fourteenth Amendment claims seek redress for acts that violate personal immunities that are fundamental to the Plaintiffs." (*Id*.) He cites *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), to support his statement that

> A Due process claim brought by prisoners can be based on deprivations caused by the government's failure to train, supervise or adequately hire its employees as well as cruel and usual punishment and require a showing that the government's inaction was a custom, policy, or practice, and that the government's deliberate inaction caused the injuries.

(*Id*.)

As an initial matter, because Kough is a state prisoner and not a pre-trial detainee, his allegations of deliberate indifference and failure to protect implicate the Eighth Amendment's proscription against cruel and unusual punishment, not the Fourteenth Amendment's requirement

of due process.[12] *Bowman v. Ozmint*, No. 0:08-2517-PMD-PJG, 2009 WL 3065180, at *12 (D.S.C. Sept. 22, 2009), *aff'd*, 369 F. App'x 416 (4th Cir. 2010); ("[A]s Bowman is a state prisoner and not a pre-trial detainee, his allegations of deliberate indifference and failure to protect implicate the Eighth Amendment's proscription against cruel and unusual punishment . . . not the Fourteenth Amendment's requirement of due process."); *see also Heyward v. Price*, No. 6:18-CV-00150-JMC, 2019 WL 1416880, at *5 (D.S.C. Mar. 29, 2019), *appeal docketed*, No. 19-6460 (4th Cir. April 10, 2019) ("Although Plaintiff has alleged a violation of rights under the Fourth, Eighth, and Fourteenth Amendments, he is a convicted prisoner and, therefore, only the Eighth Amendment is relevant to the court's analysis. "); *James v. S.C. Dep't of Corr.*, No. CIV.A. 3:08-664-HFF-JRM, 2009 WL 1147994, at *4 (D.S.C. Apr. 27, 2009) ("Defendants have analyzed Plaintiff's claims under the Fourteenth Amendment. Plaintiff, however, appears to have been a convicted inmate at the time of the alleged incidents such that his claims are properly analyzed under the Eighth Amendment."). Kough's reliance on *City of Canton v. Harris* is therefore misplaced, as the *Harris* court analyzed a *pretrial detainee's* claim of deliberate indifference under the Fourteenth Amendment. Further, Kough makes no independent allegation that his Fifth and Fourteenth Amendment due process rights were violated in his Amended Complaint or his brief. Rather, he restates his allegations of deliberate indifference and failure to train, which are more appropriately addressed under the Eighth Amendment, as discussed above. Accordingly, the undersigned recommends granting Defendants summary judgment on Kough's claims for violation of his Fifth and Fourteenth Amendment rights and dismissing those claims.

---

[12] Technically, the Fourteenth Amendment is applicable but only to the extent that the Eighth Amendment protection against infliction of cruel and unusual punishments is enforced against states through the Fourteenth Amendment. *See Hewins v. Loftis*, No. 615-cv-04320-MGL-JDA, 2016 WL 11410920, at *5 (D.S.C. May 19, 2016), *adopted by*, 2016 WL 4035461 (D.S.C. July 28, 2016).

### b.    Violation of Kough's Seventh Amendment Rights

The Amended Complaint alleges that "[t]his is an action for relief brought pursuant to . . . [*inter alia*] the . . . Seventh . . . Amendment . . . to the United States Constitution." (Dkt. No. 25 at 1.) The Seventh Amendment guarantees the right to a jury trial. *Trainor v. Qwest Govt Servs., Inc.*, No. 1:18-cv-1557, 2019 WL 3459231, at *3 (E.D. Va. July 31, 2019) ("The Seventh Amendment right to a jury 'is of course a fundamental one.'" (quoting *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir. 1986)). Here, the Amended Complaint makes no allegations as to how Cohen violated Kough's Seventh Amendment right to a jury trial, and Kough does not mention this claim in his briefing. Accordingly, the undersigned recommends granting summary judgment to the extent Kough alleges a violation of his Seventh Amendment rights and dismissing this claim.

### c.    Violation of Kough's Eighth Amendment Rights

In light of the foregoing, it is clear that Kough's § 1983 claims for violation of his constitutional rights should be analyzed under the Eighth Amendment. Relevant here, Plaintiff alleges that Warden Cohen acted "in a deliberate indifferent manner" by, *inter alia*, "allowing uncontrolled violence in the correctional institution"; "failing to provide protection and security for the Plaintiff"; and allowing inmates to have dangerous weapons." (Dkt. No. 25 at 11–13.) Kough also alleges Warden Cohen failed to adequately train and supervise SCDC employees, and he "implicitly or explicitly, adopted and implemented careless and reckless policies, customs, and practices,  including . . . failing to prevent inmates from obtaining and possessing dangerous weapons." (*Id*. at 13–14.)

### 1.    Legal Standards

### i.    Failure to Protect

The Eighth Amendment requires prison officials to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Officials must take "reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In other words, "[t]he government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. Nonetheless, "[t]he burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014) (citing *Whitley v. Albers*, 475 U.S. 312, 325 (1986)). Not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Instead, the Supreme Court has outlined two requirements for an Eighth Amendment failure to protect claim. First, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In other words, the denial of the prisoner's constitutional rights must be "sufficiently serious." *Id.*; *see also Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014) ("a prisoner must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury") (internal quotation marks omitted). Second, the prison official must have a "sufficiently culpable state of mind," *id.*, which means the official either purposefully caused the harm or acted with "deliberate indifference," *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991). A prison official demonstrates deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Id.*

A prison official is deliberately indifferent if he has actual knowledge of a substantial risk of harm to a prisoner and disregards that substantial risk. *Id.* at 847; *Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (observing that "deliberate indifference" requires actual knowledge and

disregard of a substantial risk of serious injury). A prison official is not liable if he or she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844; *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (finding that a prison official was not liable, because he did not actually draw the inference that the inmate was exposed to a substantial risk of serious harm). A showing of mere negligence does not qualify as deliberate indifference. *Davidson v. Cannon*, 474 U.S. 344, 347 (1986); *see Whitley*, 475 U.S. at 319 (("[C]onduct that does not purport to be punishment at all must involve more than ordinary lack for due care . . . . [O]bduracy and wantonness, not inadvertence . . . characterize the conduct prohibited by [the Eighth Amendment]."); *see also Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991) (citing Fourth Circuit cases adopting the Supreme Court's reasoning in *Whitley*).

A prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842; *see also Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015). Direct evidence of actual knowledge is not required. *Farmer*, 511 U.S. at 842. A prison official cannot escape liability for deliberate indifference by showing that, "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. The question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health . . . and it does not matter whether the risk comes from a single source or multiple sources,

any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

However, because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware of an obvious risk to inmate health or safety. For example, they may show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, "even if the harm was not averted" because a prison official's duty is to ensure "reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)) (Kennedy, J.). Absent successful rebuttal, prison officials may be held liable for obvious risks they must have known. *Makdessi*, 789 F.3d at 133 (citing *Farmer*, 511 U.S. at 842).

### ii.     Supervisory Liability

"A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." *King v. Rubenstein*, 825 F.3d 206, 223–24 (4th Cir. 2016); *see also Harbeck v. Smith*, 814 F. Supp. 2d 608, 626–27 (E.D. Va. 2011) ("supervisors can be held liable 'in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms'" (quoting *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 Fed. App'x. 279, 282 (4th Cir. 2009)); *see also Toomer v. Baltimore*

43

*City Det. Ctr.*, No. 12-cv-0083, 2014 WL 4678712, at *5 (D. Md. Sept. 18, 2014) (considering liability of defendant supervisors both for personal liability and supervisory liability). As discussed above, the Court has found Cohen is entitled to immunity under the Eleventh Amendment for any federal claims for monetary relief brought against him in his official capacity as the warden of an SCDC correctional institution. Thus, Cohen is only subject to Plaintiff's § 1983 claims for monetary relief in his personal and supervisory capacities.

For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 464 (M.D.N.C. 2016) ("Personal involvement and affirmative misconduct or tacit authorization are necessary to establish the direct liability of a supervisor."); *Harbeck*, 814 F. Supp. 2d at 627 ("To establish [] personal wrongdoing, the individual 'must have had personal knowledge of and involvement in the alleged deprivation of appellant's rights in order to be liable.'" (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir.1985)); *cf. Toomer*, 2014 WL 4678712, at *4 ("Any attempt to hold [Defendants] personally liable on the basis of failure to protect is unavailing because Plaintiff's allegations do not support that any of these three Defendants knew of a specific threat to Plaintiff's safety and then acted with deliberate indifference to that knowledge.").

Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

In the context of a failure to protect claim premised on supervisory liability, Plaintiff "assumes a heavy burden of proof," as he "not only must demonstrate that

44

the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." *Slakan*, 737 F.2d at 373. Generally, a plaintiff cannot satisfy this heavy burden of proof "by pointing to a single incident or isolated incidents." *Id.* But, "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Id.* (citations omitted).

*Toomer*, 2014 WL 4678712, at *5.

Relatedly, to impose supervisory liability under § 1983 for failure to train subordinates, a plaintiff must plead and prove that: (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) the failure to train actually caused the subordinates to violate the plaintiff's rights. *Hubbard v. Byars*, No. 8:14-cv-33-BHH, 2015 WL 337642, at *12 (D.S.C. Jan. 26, 2015) (quoting *Brown v. Mitchell*, 308 F.Supp.2d 682, 701 (E.D. Va. 2004)).

## 2.    Analysis of Eighth Amendment Claims

As noted, Kough alleges that Cohen was deliberately indifferent to his Eighth Amendment rights by, *inter alia*, failing to protect Kough from the risk of harm from assault by other inmates with contraband weapons at Ridgeland, failing to properly train and supervise the prison staff, and failing to prevent inmates from obtaining and possessing dangerous weapons.[13] Here, Defendants

---

[13] To the extent Kough attempts to bring a § 1983 claim for deliberate indifference to his serious medical needs, such a claim fails. "Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available." *Coates v. Summerfield*, No. 18-cv-3281, 2019 WL 4392539, at *2 (D. Md. Sept. 13, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994)). Here, the Amended Complaint makes no allegations that would establish Warden Cohen acted with deliberate indifference to Kough's serious medical needs under a § 1983 deliberate indifference claim. Moreover, the parties do not expressly address any such claim in their briefings. Nor does Kough offer any evidence that would support such a claim. Thus, the undersigned recommends Kough has failed to establish any § 1983 claim for deliberate indifference to a serious medical need.

assert that Plaintiff "cannot establish the subjective element necessary to evince an Eighth Amendment violation because no one, outside of Plaintiff's assailants, knew he would be assaulted." (Dkt. No. 88-1 at 14.) Defendants further assert that "Plaintiffs' argument that Defendants had a generalized knowledge of contraband and staffing issues and then disregarded these issues, creating an excessive risk of harm to the health and safety of all inmates within SCDC confinement, lacks both factual and legal support." (Dkt. No. 102 at 3–4.) Finally, Defendants argue that Cohen is entitled to qualified immunity here because "Plaintiff has failed to demonstrate that Warden Cohen violated his constitutional rights." (Dkt. No. 88-1 at 19.)

Contrary to Defendants' assertion, there is ample evidence to support Plaintiff's argument that a substantial risk of serious harm was longstanding, pervasive, and well-documented before the attack on him occurred. As an initial matter, the Roth Report demonstrates that Ridgeland was severely understaffed during the time period relevant to this case; that the staffing levels directly impacted the number of contraband related incidents and incidents of assault; and that Ridgeland experienced a higher than average number of contraband related incidents and incidents of inmate-on-inmate assault.

More specifically, the Report states that Ridgeland has "consistently been operating at extremely deficit levels . . . for an extended period." (Roth Report at 213.) The Report notes that "At Ridgeland, significant contraband related incidents involving weapons and/or cell phones were more prevalent than in any other facility reviewed," and the number of inmate-on-inmate assaults at Ridgeland was higher than that reported by other male level 2 facilities reviewed. Cohen's deposition testimony establishes that, as warden, he would have been notified of these high numbers of contraband related incidents and incidents of inmate-on-inmate assaults at Ridgeland between 2015 and 2018. Further, the Report makes a number of recommendations for an "effective

46

prevention and detection plan" to decrease the number of contraband related incidents and incidents of assault. There is no evidence in the record that Cohen ever took steps such as those recommended in the Roth Report to address the staffing issues.

Likewise, there is no evidence in the record that Cohen took *any* steps to address the staffing issues at Ridgeland, despite knowledge that inmate-on-inmate assaults were occurring when SCDC employees were not on their assigned wing. Defendant Cohen has testified that if a correctional officer must leave their assigned wing, they should first secure the wing by locking all the cell doors. (Dkt. No. 4-1 at 97–98.) Prior to the incident at issue, another inmate, Joseph Wilson, grieved about his assault by another inmate on April 12, 2016, and stated there was no correctional officer on his housing wing at the time of the assault. (Dkt. No. 86-12.) There is no evidence Cohen investigated this alleged policy violation by the implicated correctional officer. Similarly, here, Lieutenant Officer Torres avers that he was "the only correctional officer assigned to the Savannah Housing Unit at Ridgeland" on the day of Kough's assault. As detailed above, Torres avers that he opened all the cell doors in the B wing of the Savannah Housing Unit, where Kough was located, before leaving the B wing to unlock the doors in the A wing of the Savannah Housing Unit. Per the May 2, 2016 Post Order, Torres never should have left the B wing. There is no evidence that Cohen addressed this police violation after Kough's assault. Further, Washington's deposition testimony indicates that staff violation of Post Orders was an ongoing issue, as she had recommended "wing officers need[ed] to be more observant and monitor which inmates are entering which cells."

In addition, Mr. Aiken's opinion testimony indicates that the number of contraband related incidents and the staffing levels at Ridgeland prior to the incident at issue should have given Cohen the requisite notice of a threat to Kough's safety. More specifically, he notes that in 2014, "278

knives, homemade knife/shanks were confiscated" at Ridgeland; in 2015, "407 knives, homemade knife/shanks were confiscated"; and in 2016, a total of "414 knives, homemade knife/shanks were confiscated." (Dkt. No. 97-3 at 6.) Mr. Aiken opines that these levels of contraband "placed Defendants on specific and validated notice to a reasonable degree of certainty that Plaintiff[] [was] placed in life endangerment peril while . . . under the Defendants' custody and control." (*Id.*) According to Mr. Aiken, these contraband levels are "a clear validation that the contraband control as well as inmate supervision and gang management systems are in failure mode." (*Id.* at 7.) He further opines that "Staff is not providing the necessary security supervision to prevent, detect, respond, and contain the situations prior to deterioration into life-threatening critical events involving violence." (*Id.*)

Given the above evidence, the undersigned recommends there is a genuine dispute of a material fact as to Cohen's deliberate indifference to a threat to Plaintiff's safety. Likewise, there is a genuine dispute of material fact as to whether Cohen sufficiently ensured that his staff were properly trained and that they adhered to prison policies. As noted, the record indicates that SCDC employees directly violated prison policy, yet there is no evidence Cohen ever took any steps to address these policy violations. Further, there is no evidence Cohen took steps to better train staff to address the high number of contraband related incidents and incidents of inmate-on-inmate assault at Ridgeland. *See*, *e.g.*, *Stephens v. S.C. Dep't of Corr.*, No. 4:17-cv-3482-JFA-TER, 2018 WL 3215644, at *3 (D.S.C. June 12, 2018) ("Plaintiffs' allegations that various correctional officers left their assigned wings unattended and, in some instances, left inmate room doors unlocked, are sufficient to state a claim that [defendant wardens] failed to properly train their subordinates in correct policies and procedures given the known incidents of violence within the facility."), *adopted by*, 2018 WL 3209709 (D.S.C. June 29, 2018). The above evidence also creates

48

a genuine dispute of material fact as to whether Cohen adopted reckless policies, customs, or practices in failing to prevent inmates from obtaining and possessing dangerous weapons.

The case law in this circuit supports denying summary judgment as to these claims. The evidence here is similar to that in *Wynn v. Perry*, wherein the court found a genuine issue of material fact as to the plaintiff's Eighth Amendment failure to protect claim against the defendant prison administrator based on his assault by another inmate. No. 3:14-CV-625-FDW, 2018 WL 1077321, at *28 (W.D.N.C. Feb. 27, 2018). In finding an issue of material fact, the *Wynn* court noted that the plaintiff

> has shown that a substantial risk of serious harm was longstanding, pervasive, and well-documented before the attack on him occurred. As Acting Administrator and Administrator at Lanesboro, Defendant Parsons knew via PA announcements, emails, phone calls, and incident reports, that inmate-on-inmate attacks with contraband weapons frequently occurred in the prison and were especially pervasive on the Union housing unit where Plaintiff was housed. Defendant Parsons had access to tools for reducing the danger in the housing units and there is a genuine dispute with regards to whether he took reasonable actions to reduce the threat to inmates' safety.

*Id.* Notably, the court found no issue with the plaintiff's failure to establish that the prison administrator knew "of a specific risk" to the plaintiff posed by a specific inmate. The court quoted *Farmer*, 511 U.S. at 843, for the proposition that "a prison official may not avoid liability simply because he was unaware that Plaintiff was 'especially likely to be assaulted by the specific prisoner who eventually committed the assault.'" *Id.* The *Wynn* court further found that the evidence created "a dispute about whether Defendant Parsons sufficiently ensured that his staff were properly trained and that they adhered to security and safety policies. Material issues of fact preclude summary judgment for Defendant Parsons under these circumstances." *Id.*

Similarly, in *Hollabaugh v. Cartledge*, the court found a genuine issue of material fact as to the plaintiff's Eighth Amendment failure to protect claim against the defendant warden and

49

defendant associate warden where the plaintiff alleged he was beaten and stabbed by other inmates after "his cell door was left unlocked and unsecured . . . in violation of SCDC policy." No. 9:14-cv-1324-BHH-BM, 2016 WL 11423538, at *2 (D.S.C. Mar. 7, 2016). The court denied the defendants summary judgment on this claim because the plaintiff had "presented evidence sufficient to create an inference that the Defendants were aware of the dangerous conditions that had been created at the prison by virtue of their policies and customs relating to cell access and freedom of movement, thereby resulting in a dangerous situation to the Plaintiff which ultimately led to his being assaulted." 2016 WL 11423538, at *8. More specifically, the court found that the defendants "both knew of and allowed a system to be put in place where inmate cells were unlocked during the course of the day with minimal supervision or oversight, thereby allowing prison inmates unfettered access to other inmate's cells, through which a culture of gang violence and control was able to be imposed on the inmate population." *Id*. at *7. Similar to the instant matter, the *Hollabaugh* defendants argued that "that they had no prior notice that Plaintiff was in danger or would be subjected to attack prior to the incident occurring." *Id*. at *8. The plaintiff further acknowledged that prior to the assault at issue, "he had never been threatened by any particular inmates nor was there any specific individual that he had concerns about." *Id*. at *5.

In light of the foregoing, the undersigned recommends Cohen is not entitled to summary judgment on Plaintiff's Eighth Amendment claims.[14] The undersigned further recommends Cohen is not entitled to qualified immunity. It has long been established that prison officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other

---

[14] Defendants also oppose Plaintiff's § 1983 Eighth Amendment claims on the basis that "Plaintiff alleges SCDC and Warden Cohen are responsible for the other inmates' assault upon him, based solely upon the fact that that assault happened." (Dkt. No. 88-1 at 21–24.) This argument lacks merit. As detailed above, there is ample evidence in the record to demonstrate a genuine issue of material fact on Kough's § 1983 Eighth Amendment claims. Contrary to Defendants' assertions, Kough does not rely on "invalid logical deductions to draw inaccurate causal connections." (*Id*. at 24.) To the extent Defendants use this argument to attack the opinions of Kough's expert, that argument has been addressed in detail and rejected in a prior Order (Dkt. No. 137).

prisoners. *See Farmer*, 511 U.S. at 833. Questions of fact exist with regards to whether Cohen violated Plaintiff's clearly established rights as discussed above, and therefore, the undersigned cannot determine at this time whether Cohen's actions were objectively reasonable. *See, e.g., Kane v. Beaufort Cty. Sheriffs Dep't*, No. 9:14-cv-508-RMG, 2015 WL 404570, at *5 (D.S.C. Jan. 29, 2015) ("summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants" (quoting *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998)). Accordingly, the undersigned recommends that the Court deny Cohen summary judgment here on the grounds of qualified immunity. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (Defendant entitled to qualified immunity only insofar as the conduct alleged did not violate clearly established statutory or constitutional rights of which a reasonable person should have known); *Newkirk v. Enzor*, 674 Fed. Appx. 276 (4th Cir. 2017) (affirming denial of summary judgment on qualified immunity where facts remained in dispute).

### 4.    Kough's State Law Claims for Violation of SCTCA

The Amended Complaint alleges that Warden Cohen and SCDC "acted in a negligent, grossly negligent, reckless, willful and wanton manner" in violation of the SCTCA by "allowing uncontrolled violence in the correctional institution, . . . failing to provide protection and security for the Plaintiff, [and] . . . in failing to discipline its correctional officers for violations of SCDC policies and procedures." (Dkt. No. 25 ¶¶ 122, 123.) Defendants argue that Plaintiff relies on "conclusory allegations" to argue that "SCDC exercised its responsibilities and duties in a grossly negligent manner." (Dkt. No. 88-1 at 7.)

The SCTCA "constitutes the exclusive remedy for any tort committed by an employee of a governmental entity." S.C. Code Ann. § 15–78–70(a). An employee of a governmental entity is

immune from liability for tortious acts committed within the scope of his official duties. Such an employee who allegedly commits a tort while acting within the scope of his official duty is not liable except for actual fraud, actual malice, intent to harm, or a crime involving moral turpitude. S.C. Code Ann. § 15–78–70(a) and (b). Here, Defendants assert that the state law claims are brought against Cohen in his official capacity only and that Kough does not allege claims against Cohen involving actual fraud, actual malice, intent to harm, or a crime involving moral turpitude. (Dkt. No. 88-1 at 5–6, 11–12.) Indeed, allegations of negligence and gross negligence "do not include 'intent to harm' as elements," which must be an element of the tort to apply personal liability on a state employee under the SCTCA. *Gallmon v. Cooper*, No. CV 3:17-59-TLW-PJG, 2018 WL 4957406, at *7 (D.S.C. Apr. 19, 2018) (noting that while intent is an element of gross negligence, the specific element of "intent to harm" or "malicious intent" must be an element of the tort to apply personal liability on a state employee under the South Carolina Tort Claims Act and therefore Plaintiff's claim for gross negligence should be dismissed), *adopted in part, rejected in part*, 2018 WL 4403389 (D.S.C. Sept. 17, 2018); *Barnes v. Thueme*, No. 5:13-cv-2349-RMG, 2013 WL 5781711, at *1 (D.S.C. Oct. 25, 2013) (finding that plaintiff's state tort law claims of negligence and gross negligence, amongst other claims, must be brought in state court under the SCTCA because Plaintiff's state law claims fail to allege an intent to harm or actual malice), *aff'd*, 559 F. App'x 205 (4th Cir. 2014); *see Eldeco, Inc. v. Charleston Cty. Sch. Dist.*, 642 S.E.2d 726, 731–32 n.5 (S.C. 2007) (holding that the exception to the waiver of governmental immunity based on the employee's intent to harm in § 15-78-60(17) is not applicable where the alleged tort does not include an element of "intent to harm," which is analogous to malicious intent); *Smith v. Ozmint*, 394 F. Supp. 2d 787, 792 (D.S.C. 2005) (finding negligence claim did not include the element of "intent to harm," and thus the claim could not be asserted against state employees in

their individual capacity under the South Carolina Tort Claims Act). Accordingly, Defendants assert that SCDC is the only proper Defendant with respect to Plaintiff's state law claims regarding the actions of its employees, including Cohen.

Kough does not directly respond to these arguments. Rather, he states that "any actions by Warden Cohen with his scope of employment would fall back on SCDC for liability." (Dkt. No. 97 at 20.) Given that Kough's state law claims allege negligence and gross negligence, and these claims appear to be brought against Cohen, at most, in his official capacity, the undersigned recommends that SCDC is the proper Defendant with respect to these state law claims.[15]

The SCTCA provides that a governmental entity can be held liable for a loss resulting from a "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any . . . prisoner [or] inmate . . . of any governmental entity . . . when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15–78–60(25) (2005). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. It is the failure to exercise slight care." *Jinks v. Richland Cty.*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003) (internal citation omitted). "The term is relative and means the absence of care that is necessary under the circumstances." *Moore by Moore v. Berkeley Cty. Sch. Dist.*, 326 S.C. 584, 591, 486 S.E.2d 9, 13 (Ct. App. 1997). Gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference. *Bass v. S.C. Dep't of Soc. Servs.*, 414 S.C. 558, 571, 780 S.E.2d 252, 259 (2015).

Here, Kough relies on the same evidence to support both his § 1983 claims and his state law claims. This evidence has been detailed above and discussed at length in the context of

---

[15] As discussed above, the Eleventh Amendment does not bar these state law claims against SCDC.

Kough's Eighth Amendment claims. For the same reasons the undersigned recommends summary judgment be denied on Kough's Eighth Amendment claims, summary judgment should also be denied to SCDC on the state law claims. *See A.P. ex rel. Bazerman v. Feaver*, No. 04–15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008) ("[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."). For example, as discussed above, Lieutenant Officer Torres avers that he was "the only correctional officer assigned to the Savannah Housing Unit at Ridgeland" on the day of Kough's assault. Torres further avers that he opened all the cell doors in the B wing of the Savannah Housing Unit, where Kough was located, before leaving the B wing to unlock the doors in the A wing of the Savannah Housing Unit. Per the May 2, 2016 Post Order, Torres should not have left the B wing, as he could not see any of the inmates in the B wing when he went to unlock the doors of the A wing. Indeed, this Post Order states that a Housing Unit Officer's duties include that an "Officer will remain on assigned wing at all times to maintain sight and sound of inmates."[16] Thus, it appears Torres violated Ridgeland policy. In addition, there is no evidence Cohen addressed this violation of the Post Order after Kough's assault. Further, Washington's deposition testimony indicates that staff violations of Post Orders were an ongoing issue, as she had recommended "wing officers need[ed] to be more observant and monitor which inmates are entering which cells."

Also discussed above, the Roth Report demonstrates that Ridgeland was severely understaffed between 2015 and 2018; that the staffing levels directly impacted the number of contraband related incidents and incidents of assault; and that Ridgeland experienced a higher than average number of contraband related incidents and incidents of inmate-on-inmate assault. Cohen's deposition testimony indicates that he would have been aware of these numbers, yet there

---

[16] This Post Order appears to directly refute Defendants' argument that "there is no SCDC policy or procedure requiring that a corrections officer be present on every housing wing at all times." (Dkt. No. 88-1 at 8.)

is no evidence he took any steps to address the staffing issues at Ridgeland between 2015 and 2018. In addition, Mr. Aiken's opinion testimony, discussed *supra*, indicates that the number of contraband related incidents and the staffing levels at Ridgeland prior to the incident at issue should have given Cohen the requisite notice of a threat to Kough's safety.

Based on the foregoing, the undersigned recommends there is a question of fact as to whether SCDC is liable for the alleged negligence and gross negligence of Torres and Cohen. Accordingly, summary judgment is not appropriate on Kough's state law claims for negligence and gross negligence against SCDC. *See Bass*, 414 S.C. at 571 (gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference).

### 5.    Injunctive Relief

Finally, Kough alleges a claim for injunctive relief pursuant to S.C. Code Ann. § 15-43-30 and 42 U.S.C. § 1983.[17] More specifically, the Amended Complaint seeks injunctive relief

> to redress the Defendants' above described ongoing deliberate indifference, reckless, malicious, wanton and grossly negligence [sic] in policies, practices, habits, customs, usages, training and supervision with respect to the rights of the Plaintiffs herein to be secure in their persons, to be properly protected, to receive humane treatment, to be provided necessary and appropriate medical care, to be protected from cruel and unusual punishment, and to [] have their lives protected from unprovoked attacks and threats, among other rights of the Plaintiffs.

(Dkt. No. 25 at 11.) According to the Amended Complaint,

> Injunctive relief is necessary due to the nature of the threats against the Plaintiffs herein shown in that Plaintiffs will suffer irreparable harm if such injunction is not granted in that, as has previously occurred, he is at risk to be attacked and injured and possibly killed. The multitude of incidents of violence against the Plaintiffs as recited herein is a clear and definite indication that without Court intervention by way of injunctive relief the likelihood of repeated incidents will occur and monetary compensation cannot replace the loss of life.

---

[17] Defendants do not argue that the Eleventh Amendment bars the claim against SCDC for injunctive relief under S.C. Code Ann. § 15-43-30. And, as discussed above, the undersigned has found that the Eleventh Amendment does not bar the § 1983 claim for prospective injunctive relief brought against Defendant Cohen in his official capacity.

(*Id.*)

Here, Defendants first assert that the claim for injunctive relief is moot because Kough has been transferred to a different SCDC institution. The undersigned takes judicial notice that Kough is currently incarcerated at Lieber Correctional Institution.[18] *See* SCDC Incarcerated Inmate Search, https://public.doc.state.sc.us/scdc-public/ (enter the plaintiff's name). The record shows that Plaintiff's projected release date is March 7, 2022. (Dkt. No. 88-2 at 1.) Plaintiff asserts his claim for injunctive relief is not moot because he is "still fearful for [his] life," and there continues to be a "high rate of contraband and violence occurring in SCDC." (Dkt. No. 97 at 31.) According to Plaintiff, "the SCDC failures alleged by the Plaintiff[] are not just Ridgeland related; they are systemic and system wide issues." (*Id.* at 32.)

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Relevant here, "an inmate's transfer to a separate prison facility moots his requests for injunctive relief, so long as the transfer prevents the inmate from encountering those same allegedly unconstitutional prison conditions that gave rise to his original grievances." *Turner v. Clelland*, No. 1:15-cv-947, 2016 WL 6997500, at *13 (M.D.N.C. Nov. 30, 2016), *adopted sub nom. Turner, Jr. v. Clelland*, 2017 WL 913630 (M.D.N.C. Mar. 7, 2017) (citing, *e.g.*, *West v. Grams*, 607 Fed. App'x. 561, 566 (7th Cir. 2015) (noting that "a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice"); *Wright v. Bennett*, No. 5:08-CT-3129, 2010 WL 3075519, at *3 (E.D.N.C. Aug. 4, 2010) (explaining that "[t]he Fourth Circuit has consistently held that when a prisoner is no longer

---

[18] A federal court may take judicial notice of factual information located in postings on governmental websites in the United States. *See Mitchell v. Newsom*, Case No. 3:11-cv-0869-CMC-PJG, 2011 WL 2162723, at *3 n.1 (D.S.C. May 10, 2011) (collecting cases), *adopted by* 2011 WL 2162184 (D.S.C. June 1, 2011).

subject to the alleged unconstitutional condition, the claim is moot," and citing cases)); *see also*
*Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (concluding that the inmate's transfer to
another prison rendered moot his claims for declaratory and injunctive relief, "since he is unlikely
to return to [that prison]").

     Here, the Roth Report provides compelling evidence that SCDC "faces a significant
shortage in the number of security personnel available to meet the mission of the agency." (Roth
Report at 1.) As discussed above, the Roth Report is dated March 2018 and provides a "security
staffing assessment" for 13 SCDC institutions, including Ridgeland and Lieber. Based on the
widespread staffing issues at SCDC, the documented effects such staffing issues has on incidents
of contraband and assaults, and the lack of evidence that any action has been taken to remedy these
issues following the Roth Report, the undersigned finds Kough's transfer from Ridgeland does not
remove the possibility that Kough will suffer similar future violations under federal law and state
tort law while incarcerated. *Cf. Turner*, 2016 WL 6997500, at *13 (finding injunctive relief moot
in part because plaintiff was transferred to a different prison institution and the "requests for
injunctive relief involving ACI's staff do not purport to address any problem existing throughout
the state prison system"). Accordingly, the undersigned recommends this claim not be denied as
moot.

     Defendants also argue for summary judgment on Plaintiff's claim for injunctive relief
because Kough "has failed to show that he will suffer irreparable harm or that he has no adequate
remedy at law." (Dkt. No. 88-1 at 24.) Generally, equitable relief is available only where there is
no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298 S.C. 179,
185, 379 S.E.2d 119, 123 (1989). "An 'adequate' remedy at law is one which is as certain,
practical, complete and efficient to attain the ends of justice and its administration as the remedy

in equity." *Id*. The party seeking an injunction must prove it has no adequate remedy at law. *Strategic Res. Co. v. Bcs Life Ins. Co*., 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). Also, "[e]quity will not interfere by the granting of the extraordinary remedy of injunction where the anticipated nuisance is doubtful, contingent or conjectural." *Welborn v. Page*, 247 S.C. 554, 566, 148 S.E.2d 375, 381 (1966).

Plaintiff contends that monetary damages are not adequate here because "the crux" of his allegations go to "the inadequate safety and security that SCDC is providing to the Plaintiff[]." (Dkt. No. 97 at 30–31.) According to Kough, "monetary relief is not an adequate remedy at law to ensure the continued protection of the Plaintiff[]." (*Id*. at 31.) Kough further asserts that "[f]ailing to provide injunctive relief to the Plaintiff[] despite having threats on [his life], with a high rate of contraband and violence occurring in SCDC, with understaffing issues prevalent[,] would most definitely result in irreparable harm." (*Id*.) Given Kough's allegations and the evidence in the record, detailed above, the undersigned recommends that Defendants' arguments for dismissal are without merit, and Kough's claim for injunctive relief should not be dismissed at this time.[19]

## V.    CONCLUSION

For the foregoing reasons, it is RECOMMENDED that Defendants' Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART. (Dkt. No. 88.) Specifically, the undersigned recommends that summary judgment should be denied as to Kough's claims on the issue of exhaustion. Summary judgment should also be denied as to Kough's § 1983 Eighth

---

[19] Here, Defendants also briefly argue that Rule 65 of the South Carolina Rules of Civil Procedure requires "[v]erification of a Plaintiff's Complaint . . . for the issuance of an injunction." (Dkt. No. 88-1 at 26.) Rule 65(b), SCRCP provides that "No temporary restraining order shall be granted without notice of motion for the order to the adverse party unless it clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before notice can be served and a hearing had thereon." Here, the undersigned is not convinced that Rule 65(b), SCRCP, applies here, where the action has already been commenced by filing and service of the summons, and the claim is for a permanent injunction rather than a temporary one. Accordingly, the undersigned finds this argument for dismissal to be without merit.

Amendment claims brought against Defendant Cohen in his individual capacity, his § 1983 claim for prospective injunctive relief brought against Defendant Cohen in his official capacity, his state law claims for negligence and gross negligence against SCDC, and his state law claim for injunctive relief against SCDC. The remainder of Plaintiff's claims should be dismissed with prejudice.

      IT IS SO RECOMMENDED.

November 25, 2019
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).